Harold Lee JONES, Appellee,

v.

**SUPERINTENDENT, VIRGINIA STATE FARM, Appellant.**

No. 71–1808.

United States Court of Appeals, Fourth Circuit.

Sept. 1, 1972.

Before HAYNSWORTH, Chief Judge, and CRAVEN and FIELD, Circuit Judges.

CRAVEN, Circuit Judge:

This excellent petition for rehearing is deserving of our most careful attention. Not only is the petitioner entitled to a complete explanation of an apparent disregard of precedent, but so also is the bar, and we are grateful to able and persistent counsel for affording us a long-awaited opportunity to explain to the bar and to the public some of our internal procedures in the disposition of what has become an enormous annual caseload.

The question on appeal in this case was whether there is a constitutional obligation on the states to furnish free to indigents trial transcripts for purposes of collateral attack absent a showing of need. We answered the question negatively in this case and had previously answered affirmatively in an unreported memorandum decision—at least where a transcript was in existence and possessed by the state or by petitioner's attorney.

In Knight v. Coiner, No. 14,940 (4th Cir. February 11, 1971), the petitioner had made numerous attempts to obtain a copy of the transcript of state court proceedings from his attorney at the time, or, in the alternative, a new copy at state expense. The memorandum decision contained an alternative order: that if the district court determines that a transcript exists, the court "may order the state clerk's office in which it is lodged to produce it, or, if it is in the possession of counsel, the district court may order counsel to surrender it."

We cited United States v. Shoaf, 341 F.2d 832 (4th Cir. 1964), for the proposition that "a prisoner is not entitled to receive a free transcript for the purpose of combing it to discover flaws in his trial." We also commented that the Supreme Court has "required that judicial action be taken to aid the prisoner in acquiring the transcript" where one exists. But we failed to note what kind of judi-

Burnett Miller, III, Asst. Atty. Gen. of Virginia and Andrew P. Miller, Atty. Gen., on brief, for appellant.

Professor William A. Reppy, Jr., Chapel Hill, N. C., Court-appointed, for appellee.

cial action, and that the Supreme Court had specifically declined to decide "whether there are circumstances in which the Constitution requires that a State furnish an indigent state prisoner, free of cost, a trial transcript to aid him to prepare a petition for collateral relief." Wade v. Wilson, 396 U.S. 282. 286, 90 S.Ct. 501, 504, 24 L.Ed.2d 470 (1970). Instead, unnoticed by us in our memorandum decision, the Supreme Court had suggested that the district court on remand should abstain from granting federal relief until other possibilities of obtaining a copy of the transcript, whether borrowing one from his codefendant or the state, or successfully applying to a state court, had been exhausted. Wade v. Wilson, *supra.*

It is thus apparent that our decision in *Knight, supra,* whether right or wrong, was not a carefully reasoned or fully expostulated one. We followed *Wade, supra,* but we did not track it closely. Instead of instructing the district judge on remand to initially pursue other remedies, *i. e.,* dislodging the transcript from the possession of counsel, or abstaining in favor of action by a state court, we authorized him in the alternative to obtain the transcript either from the state clerk's office or from counsel, who, somewhat incredibly, insisted on retaining it against the interest of his former client.

In the opinion in the instant case, 4 Cir., 460 F.2d 150, which we are now asked to recall and reconsider, we did a better job. We went back beyond *Shoaf, supra,* to United States v. Glass, 317 F. 2d 200, 202 (4th Cir. 1963), and relying on Lane v. Brown, 372 U.S. 477, 83 S.Ct. 768, 9 L.Ed.2d 892 (1963), made it perfectly clear that in this circuit "when a need for a transcript in order to collaterally attack a conviction is shown, equal protection and due process require the state to furnish an indigent prisoner such transcript without charge." We announced what seemed to us a proper corollary of that proposition: "the state may constitutionally decline to furnish

an indigent with a transcript until a need for it is shown, even though the transcript is already in existence." We rejected any balancing test, stating quite clearly that where there is a need the right is absolute, regardless of expense or inconvenience to the state, and that where there is not, the right does not exist, regardless of how easily and inexpensively the state might be able to furnish a transcript.

Although we deliberately failed to mention Knight v. Coiner, we effectively overruled it. The two decisions are, of course, irreconcilable. Had *Knight* ordered relief against recalcitrant counsel only, there would be no conflict, but as explained, *supra,* the mandate was broader and ran against the state.

Quite properly petitioner now urges upon us that reconsideration is necessary in order "(1) to secure uniformity of decisions of this court and (2) to settle a question of far reaching importance: the status of precedent to be accorded an unpublished memorandum decision of this Court." We agree.

No appellate court can ever be much better than its bar. The bar of our court is the source of the raw material with which we work: facts, inferences, ideas, insights, and prior decisions, the stare decisis effect of which is now so forcibly called to our attention. But we cannot always use the bar, and if we were to attempt it, we think the bar could not possibly respond to our increased demands upon it with the degree of quality needed.

The best explanation of our problem, prepared *ante litem motum,* is perhaps Chief Judge Haynsworth's report to Mr. Justice Clark, then director of the Federal Judicial Center, on screening appeals and related matters in the Fourth Circuit. Set out in the appendix are excerpts from this report sent to the Federal Judicial Center in 1968.

■ Judge Haynsworth's report to the Federal Judicial Center demon-

strates, we think, the compelling necessity for some abbreviation of normal procedures in the disposition of appeals that have now increased to 1,405 filed in fiscal year 1972, with a predictable rise in the years ahead. We believe that our screening procedures and disposition by unreported memorandum decisions accords with due process and our duty as Article 3 judges, but we confess its imperfection. We concede, of course, that any decision is by definition a precedent, and that we cannot deny litigants and the bar the right to urge upon us what we have previously done. But because memorandum decisions are not prepared with the assistance of the bar, we think it reasonable to refuse to treat them as precedent within the meaning of the rule of stare decisis. We prefer that they not be cited to us for an additional reason: since they are unpublished and generally unavailable to the bar, access to them is unequal and depends upon chance rather than research. For this reason, also, we will not ourselves in published opinions cite or refer to memorandum decisions. But although unmentioned, it should be clearly understood by the bench and bar that any prior memorandum decision in conflict with a subsequently published opinion is to be considered overruled.

Upon reconsideration, we adhere to our prior opinion and decision in this case. This opinion has been seen by all of the active judges of the court, none of whom have asked that the court be polled on the suggestion for rehearing en banc.

Motion denied.

## APPENDIX

.  .  .  .  .  .

When Judge Soboloff and I went on the Court in 1956 and 1957, it was Judge Parker's established practice of fully hearing every postconviction case. A lawyer was appointed in each one of them, and each was fully heard.  .  .  .

Appeals in postconviction cases were then relatively few in number. They were not a recognized burden, but by 1962 their number had grown to the point that Judge Soboloff, then the Chief Judge, was led to the conclusion that some protective procedures were necessary. This conclusion came not just from the fact of the substantial increase in the number of appeals, but from the fact that from experience we had observed that a substantial proportion of them were frivolous. Their merit did not justify the attention they were receiving, and grave problems were being encountered in obtaining lawyers to handle such cases. Lawyers find it a very frustrating experience to be appointed to handle an appeal in which there is no merit and, if one seeks to withdraw after accepting an appointment, a large amount of judicial time must be expended in handling collateral problems.

Under Judge Soboloff's leadership, therefore, and with the help of a young lawyer employed in the Clerk's office, we began a system of screening postconviction and other *pro se* appeals. Initially, it was designed simply to surface the purely frivolous appeals which were then disposed of by a memorandum order without the appointment of counsel, if a lawyer was not already representing the appellant, and without oral argument.

At the outset, however, we were all concerned with the necessity of surrounding any summary disposition procedure with some safeguards. Even in the case of a state prisoner habeas corpus appeal in which no certificate of probable cause to appeal had been issued, we were not content to have the appeal foreclosed by one judge, who, after reviewing the papers, concluded that a certificate of probable cause to appeal should be denied.  .  .  .

As we contemplated withdrawing from the earlier procedure of full hearing of every case, therefore, we had a tradition against summary foreclosure of appeals by one judge, or even by three, without a

full explanation of the reason for the action taken. When these cases went in the screening process, therefore, state prisoner habeas cases in which there was an application for a certificate of probable cause to appeal got the same treatment as all other postconviction cases. The papers were examined by three judges; it was dismissed as frivolous only if the three agreed that it was, and they joined in a memorandum order, which sometimes succinctly, but always adequately, stated the facts, the contentions, and the reasons for the conclusion that the appeal was frivolous.

## II

When we had developed some experience with a screening process designed to eliminate purely frivolous postconviction appeals and with more assistance from better trained habeas clerks, we found that we could do much more. For example, in the screening process, it was as easy to surface and summarily dispose of the cases which clearly required reversal as those in which there clearly was no merit at all. In stages, therefore, as the volume of our postconviction appeals swelled at an almost explosive rate, we expanded and refined our screening processes. Now no postconviction case gets on our regular hearing calendar unless at least one judge is of the opinion that a full hearing would be of assistance in its disposition. Though no one of a panel of three thinks the appeal is wholly without merit, it is decided without a hearing, unless one of the judges thinks that a full hearing would aid the decisional process.

## III

Contemporaneously with these developments, we have substantially improved the preparation of the cases in the course of the screening process. If, for instance, the record does not contain the transcript of some prior proceeding which may bear upon the issues, that transcript is obtained and incorporated in the record. Any other court record or document which should have been tendered in the trial court and incorporated in the record is obtained.

Two very able young lawyers with prior concentrated academic or practical experience in this field serve as our habeas clerks and as advocates for the appellants. They prepare memoranda which fully develop the contentions of the appellant and which incorporate in them all material which can be assembled to support the appellants' contentions. There are references, of course, to all relevant judicial decisions.

With that preparation of the record and with that development of the appellants' contentions, three judges review the entire record. Notwithstanding the fact that our habeas clerks have been found to be highly dependable, the judges do not content themselves with reading their memoranda. The record, itself, is carefully checked and examined, and any formal or informal brief which the appellant, or a lawyer in his behalf, has filed is read and studied. Then, but only then, if all three members of the panel are agreed that all relevant materials are at hand and there is no reasonable prospect that the court could derive further assistance from additional briefing and oral argument, is the case disposed of. When they are so agreed, the case is affirmed, reversed, or remanded by a memorandum decision, which quite sufficiently states the facts, the contentions, and the Court's resolution of the legal questions presented . . . .

The only postconviction cases, therefore, that get on the regular hearing calendars in the Fourth Circuit are those in which one judge of a panel of three thinks that we need more elucidation than our internal procedures have provided. . . .

.    .    .    .    .    .

We are receiving these postconviction appeals at the rate of some 500 to 600 a

year. If we were required to appoint lawyers in each case, we could exhaust the Bar, and the quality of the representation we would obtain, all Judges of the Fourth Circuit strongly feel, would be well below what we presently provide, bearing in mind the exceptionally qualified lawyers we obtain for the challenging case and the very efficient work of our habeas clerks in the routine cases. We do not think it would be an advance to turn to a system which would provide mediocre representation in most cases and less effective help than the appellants are now provided. Nor do we think we would serve our long range purposes if our demands upon the Bar were beyond its capacity to meet adequately.

From the point of view of the Court, the postconviction cases disposed of without a formal hearing require almost as much judicial time as if they were fully heard, except for the time which would be spent in a formal hearing. The formal hearing requires the attendance of three judges, however, and our summary procedure saves us a great many judge days which otherwise would be required in hearing several hundred cases. We are all convinced that only by saving that time have we been able to keep reasonably current in our hearing schedule of other cases and to stay as current as we are in their disposition. With new filings at the rate of 1,025 annually, and increasing annually at an alarming rate, we are all convinced that the seven of us would be hopelessly swamped without the advantage of the time we save through the summary procedures developed to our present point for the disposition of most postconviction cases. Important cases ought to be heard with reasonable promptness and ought to be decided without unreasonable delay. We can meet neither obligation if the processes of the court are clogged with a great mass of postconviction cases, most of which can be handled with fairness to all parties with less judicial effort.