# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

―――――――

No. 99-3917EM

―――――――

| | | |
|---|---|---|
| Faye Anastasoff, | * | |
| | * | |
| Appellant, | * | On Appeal from the United |
| | * | States District Court |
| v. | * | for the Eastern District |
| | * | of Missouri. |
| United States of America, | * | |
| | * | |
| Appellee. | * | |

―――――――

Submitted: May 8, 2000

Filed: August 22, 2000

―――――――

Before RICHARD S. ARNOLD and HEANEY, Circuit Judges, and MAGNUSON,[1] District Judge.

―――――――

RICHARD S. ARNOLD, Circuit Judge.


Faye Anastasoff seeks a refund of overpaid federal income tax. On April 13, 1996, Ms. Anastasoff mailed her refund claim to the Internal Revenue Service for taxes paid on April 15, 1993. The Service denied her claim under 26 U.S.C. § 6511(b), which limits refunds to taxes paid in the three years prior to the filing of a claim. Although her claim was mailed within this period, it was received and filed on April 16,

―――――――――――――

[1]The Hon. Paul A. Magnuson, Chief Judge, United States District Court for the District of Minnesota, sitting by designation.

1996, three years and one day after she overpaid her taxes, one day late. In many cases, "the Mailbox Rule," 26 U.S.C. § 7502, saves claims like Ms. Anastasoff's that would have been timely if received when mailed; they are deemed received when postmarked. But § 7502 applies only to claims that are untimely, and the parties agree that under 26 U.S.C. § 6511(a), which measures the timeliness of the refund claim itself, her claim was received on time. The issue then is whether § 7502 can be applied, for the purposes of § 6511(b)'s three-year refund limitation, to a claim that was timely under § 6511(a). The District Court[2] held that § 7502 could not apply to any part of a timely claim, and granted judgment for the Service. On appeal, Ms. Anastasoff argues that § 7502 should apply whenever necessary to fulfill its remedial purpose, i.e., to save taxpayers from the vagaries of the postal system, even when only part of the claim is untimely. We affirm the judgment of the District Court.

## I.

We rejected precisely the same legal argument in <u>Christie v. United States</u>, No. 91-2375MN (8th Cir. Mar. 20, 1992) (per curiam) (unpublished). In <u>Christie</u>, as here, we considered a refund claim mailed just prior to § 6511(b)'s three-year bar and received just after. Like Ms. Anastasoff, the <u>Christie</u> taxpayers argued that § 7502 should operate regardless of the claim's timeliness under § 6511(a) to save their claim under § 6511(b). We held that even if § 7502 could apply to a timely claim, it would not help in this situation: If § 7502 were applied to the claim, it would be deemed received before the return. But § 6511(a) provides that a claim must be submitted within two years of overpayment if no return has yet been filed – not three years. In other words, to save the claim under § 6511(b) only makes it untimely under § 6511(a). Ms. Anastasoff does not attempt to distinguish <u>Christie</u>. She does argue that a relevant

---

[2]The Hon. Catherine D. Perry, United States District Judge for the Eastern District of Missouri.

regulation was not cited in <u>Christie</u>, but the reasoning of the <u>Christie</u> opinion is squarely inconsistent with the effect taxpayer desires to attribute to the regulation.

Although it is our only case directly in point, Ms. Anastasoff contends that we are not bound by <u>Christie</u> because it is an unpublished decision and thus not a precedent under 8th Circuit Rule 28A(i). We disagree. We hold that the portion of Rule 28A(i) that declares that unpublished opinions are not precedent is unconstitutional under Article III, because it purports to confer on the federal courts a power that goes beyond the "judicial."

The Rule provides:

> Unpublished opinions are not precedent and parties generally should not cite them. When relevant to establishing the doctrines of res judicata, collateral estoppel, or the law of the case, however, the parties may cite any unpublished opinion. Parties may also cite an unpublished opinion of this court if the opinion has persuasive value on a material issue and no published opinion of this or another court would serve as well . . ..

Inherent in every judicial decision is a declaration and interpretation of a general principle or rule of law. <u>Marbury v. Madison</u>, 1 Cranch 137, 177-78 (1803). This declaration of law is authoritative to the extent necessary for the decision, and must be applied in subsequent cases to similarly situated parties. <u>James B. Beam Distilling Co. v. Georgia</u>, 501 U.S. 529, 544 (1991); <u>Cohens v. Virginia</u>, 6 Wheat. 264, 399 (1821). These principles, which form the doctrine of precedent, were well established and well regarded at the time this nation was founded. The Framers of the Constitution considered these principles to derive from the nature of judicial power, and intended that they would limit the judicial power delegated to the courts by Article III of the

Constitution.[3]  Accordingly, we conclude that 8th Circuit Rule 28A(i), insofar as it would allow us to avoid the precedential effect of our prior decisions, purports to expand the judicial power beyond the bounds of Article III, and is therefore unconstitutional.  That rule does not, therefore, free us from our duty to follow this Court's decision in Christie.

## II.

The doctrine of precedent was well-established by the time the Framers gathered in Philadelphia.  Morton J. Horwitz, The Transformation of American Law: 1780-1860 8-9 (1977); J.H. Baker, An Introduction to English Legal History 227 (1990); Sir William Holdsworth, Case Law, 50 L.Q.R. 180 (1934).  See, e.g., 1 Sir William W. Blackstone, Commentaries on the Laws of England *69 (1765) ("it is an established rule to abide by former precedents").  To the jurists of the late eighteenth century (and thus by and large to the Framers),[4] the doctrine seemed not just well established but an immemorial custom, the way judging had always been carried out, part of the course of the law.[5]  In addition, the Framers had inherited a very favorable view of precedent

---

[3]"The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."  U.S. Const. art. III, § 1, cl. 1.

[4]Lawyers made up majorities of the Continental Congress, the signers of the Declaration of Independence, and the Framers of the Constitution.  Perry Miller, The Legal Mind in America 16 (1962).

[5]James Wilson suggested that the doctrine of precedent was brought to England by the Romans. 1 The Works of James Wilson 343 (1967).  Chancellor Kent traced it "from the earliest periods of English history."  James Kent, Commentaries on American Law 473-78 (12th ed. 1873).  Blackstone found it "even so early as the conquest." 1 William Blackstone, Commentaries *69.  Before them, in Slade v. Morley, Sir Edward Coke suggested simply that "precedents have always been respected . . .."  4 Co. Rep. 91, 76 Eng. Rep. 1074 (K.B. 1602), reprinted in Sources of English Legal History:

from the seventeenth century, especially through the writings and reports of Sir Edward Coke; the assertion of the authority of precedent had been effective in past struggles of the English people against royal usurpations, and for the rule of law against the arbitrary power of government.[6]  In sum, the doctrine of precedent was not merely well established; it was the historic method of judicial decision-making, and well regarded as a bulwark of judicial independence in past struggles for liberty.

Modern legal scholars tend to justify the authority of precedents on equitable or prudential grounds.[7]  By contrast, on the eighteenth-century view (most influentially expounded by Blackstone), the judge's duty to follow precedent derives from the nature of the judicial power itself.[8]  As Blackstone defined it, each exercise of the "judicial

---

Private Law to 1750 428 (1986).

[6]Coke's struggle against the tyranny of the Stuarts, which the Framers identified with their own against King George, made him the legal authority most admired and most often cited by American patriots.  Bernard Bailyn, The Ideological Origins of the American Revolution 30 (1967).  Coke used precedent, and emphasized it to a greater degree than his predecessors, because it was his main weapon in the fight for the independence of the judiciary and limits on the king's prerogative rights. See Harold J. Berman and Charles J. Reid, Jr., The Transformation of English Legal Science: From Hale to Blackstone, 45 Emory L.J. 437, 450 (1996); J.G.A. Pocock, The Ancient Constitution and the Feudal Law 46 (1987).  By contrast, the only criticism of the doctrine of precedent was associated with Thomas Hobbes, who regarded the authority of precedent as an affront to the absolute power of the Sovereign.  See Thomas Hobbes, Leviathan 323-26 (Penguin ed. 1985).

[7]See, e.g., Frederick Schauer, Precedent, 39 Stan. L. Rev. 571, 595-602 (1987) (noting that the authority of precedent is commonly supported by arguments:  (1) from fundamental fairness, i.e., that like cases should be treated alike; (2) from the need for predictability; and (3) as an aid to judicial decision-making, to prevent unnecessary reconsideration of established matters).

[8]Blackstone's great influence on the Framers' understanding of law is a familiar fact. See Schick v. United States, 195 U.S. 65, 69 (1904) ("At the time of the adoption

power" requires judges "to determine the law" arising upon the facts of the case.  3 Blackstone, Commentaries *25.  "To determine the law" meant not only choosing the appropriate legal principle but also expounding and interpreting it, so that "the law in that case, being solemnly declared and determined, what before was uncertain, and perhaps indifferent, is now become a permanent rule . . .."  1 Commentaries *69.[9]  In determining the law in one case, judges bind those in subsequent cases because, although the judicial power requires judges "to determine law" in each case, a judge is "sworn to determine, not according to his own judgements, but according to the known laws. [Judges are] not delegated to pronounce a new law, but to maintain and expound the old."  Id.  The judicial power  to determine law is a power only to determine what the law is, not to invent it.  Because precedents are the "best and most authoritative" guide of what the law is, the judicial power is limited by them.  Id.  The derivation of precedential authority from the law-declaring nature of the judicial power was also familiar to the Framers through the works of Sir Edward Coke and Sir Matthew Hale.  See 4 E. Coke, Institutes of the Laws of England 138 (1642) (a prior judicial decision on point is sufficient authority on a question of law because "a judicial decision is to the same extent a declaration of the law.");  1 Coke,  Institutes 51 (1642) ("[i]t is the function of a judge not to make, but to declare the law, according to the golden mete-wand of the law and not by the crooked cord of discretion.");  Sir Matthew Hale, The History of The Common Law of England 44-45 (Univ. of Chicago ed., 1971) ("Judicial Decisions [have their] Authority in Expounding, Declaring, and Publishing what the Law of this Kingdom is . . ..").

---

of the Federal Constitution, it [Blackstone's work] had been published about twenty years, and it has been said that more copies of the work had been sold in this country than in England; so that undoubtedly, the framers of the Constitution were familiar with it.");  Daniel Boorstin, The Mysterious Science of Law 265 (1941).

[9]This need not be done by way of a reported opinion.  The record of the judicial proceedings and decision alone is sufficient evidence of the legal principles necessary to support the decision to provide "light or assistance" when "any critical question arises." 1 Blackstone, Commentaries *69.

In addition to keeping the law stable, this doctrine is also essential, according to Blackstone, for the separation of legislative and judicial power. In his discussion of the separation of governmental powers, Blackstone identifies this limit on the "judicial power," i.e., that judges must observe established laws, as that which separates it from the "legislative" power and in which "consists one main preservative of public liberty." 1 Blackstone, Commentaries *258-59. If judges had the legislative power to "depart from" established legal principles, "the subject would be in the hands of arbitrary judges, whose decisions would be then regulated only by their own opinions . . .." Id. at *259.

The Framers accepted this understanding of judicial power (sometimes referred to as the declaratory theory of adjudication) and the doctrine of precedent implicit in it.[10] Hamilton, like Blackstone, recognized that a court "pronounces the law" arising upon the facts of each case.[11] The Federalist No. 81, at 531 (Alexander Hamilton) (Modern Library ed., 1938). He explained the law-declaring concept of judicial power in the term, "jurisdiction": "This word is composed of JUS and DICTIO, juris dictio, or a speaking and pronouncing of the law," id., and concluded that the jurisdiction of appellate courts, as a law-declaring power, is not antagonistic to the fact-finding role

_____

[10]See Letter from James Madison to Charles Jared Ingersoll (June 25, 1831), reprinted in The Mind of the Founder: Sources of the Political Thought of James Madison 390, 390-93 (Marvin Meyers ed., rev. ed. 1981) (describing the "authoritative force" of "judicial precedents" as stemming from the "obligations arising from judicial expositions of the law on succeeding judges . . .."); James Wilson, II The Works of James Wilson 502 (1967) ("Judicial decisions are the principal and most authentick" proof of what the law is and . . . "every prudent and cautious judge will appreciate them [because] . . . his duty and his business is not to make the law, but to interpret and apply it." Id. See also Christopher Wolfe, The Rise of Modern Judicial Review: From Constitutional Interpretation to Judge-Made Law 74 (1986); David M. O'Brien, Constitutional Law and Politics 73 (1995).

[11]James Wilson agreed: "judicium is quasi juris dictum . . . a judgment is a declaration of the law." II The Works of James Wilson 524 (1967).

-7-

of juries.  Id.  Like Blackstone, he thought that "[t]he courts must declare the sense of the law," and that this fact means courts must exercise "judgment" about what the law is rather than "will" about what it should be.  The Federalist No. 78 507-08.  Like Blackstone, he recognized that this limit on judicial decision-making is a crucial sign of the separation of the legislative and judicial power.  Id. at 508.  Hamilton concludes that "[t]o avoid an arbitrary discretion in the courts, it is indispensable that they should be bound down by strict rules and precedents, which serve to define and point out their duty in every particular case that comes before them . . .."  Id. at 510.[12]

The Framers thought that, under the Constitution, judicial decisions would become binding precedents in subsequent cases.  Hamilton anticipated that the record of federal precedents "must unavoidably swell to a very considerable bulk.  . . ."  Id.  But precedents were not to be recorded for their own sake.  He expected judges to give them "long and laborious study" and to have a "competent knowledge of them."  Id.  Likewise, Madison recognized "the obligation arising from judicial expositions of the law on succeeding judges."  Letter from James Madison to Charles Jared Ingersoll (June 25, 1831), reprinted in The Mind of the Founder:  Sources of the Political Thought of James Madison 390, 390-93 (Marvin Meyers ed., rev. ed. 1981).  Madison expected that the accumulation of precedents would be beneficial:  "[a]mong other

---

[12]Other early authorities confirm the connection between the doctrine of precedent and the separation of powers. See 1 Kent's Commentaries, Lect. XXI at 479: "Those nations, which have adopted the civil law as the main foundation of their own [recognize precedent to a far less degree than our own] . . .. With them the necessity of judiciary independence upon the executive, is not so clearly acknowledged . . .. It has been shown already that this independence requires, in a considerable degree, the acknowledgment of precedential authority."; William Cranch, Preface, 1 Cranch iii (1804): "In a government which is emphatically styled a government of laws, the least possible range ought to be left for the discretion of the judge . . . perhaps nothing conduces more to that object than the publication of reports. Every case decided is a check upon the judge. He can not decide a similar case differently, without strong reasons, which, for his own justification, he will wish to make public."

difficulties, the exposition of the Constitution is frequently a copious source, and must continue so until its meaning on all great points shall have been settled by precedents." Letter from James Madison to Samuel Johnson (June 21, 1789), in 12 Papers of James Madison 250 (Robert A. Rutland et al. eds., 1977). Although they drew different conclusions from the fact, the Anti-Federalists also assumed that federal judicial decisions would become authorities in subsequent cases.[13] Finally, early Americans demonstrated the authority which they assigned to judicial decisions by rapidly establishing a reliable system of American reporters in the years following the ratification of the Constitution. Grant Gilmore, The Ages of American Law 23 (1977); Peter Karsten, Heart Versus Head:  Judge-Made Law in Nineteenth-Century America 28-32 (1997).

We do not mean to suggest that the Framers expected or intended the publication (in the sense of being printed in a book) of all opinions.  For the Framers, limited publication of judicial decisions was the rule, and they never drew that practice into question.  Before the ratification of the Constitution, there was almost no private reporting and no official reporting at all in the American states.  Frederick G. Kempin, Jr., Precedent and Stare Decisis:  The Critical Years, 1800-1850, 3 Am. J. Leg. Hist. 28, 34 (1959) (reviewing the history of American reports).  As we have seen, however, the Framers did not regard this absence of a reporting system as an impediment to the precedential authority of a judicial decision.  Although they lamented the problems

---

[13]See, e.g., Essays of Brutus, XV (Mar. 20, 1788) in 2 The Complete Anti-Federalist, 441 (Herbert J. Storing ed., 1981):  "one adjudication will form a precedent to the next, and this to a following one.  These cases will immediately affect individuals only; so that a series of determinations will probably take place before even the people will be informed of them."  By contrast, the danger in the Federal Farmer's view was that the federal courts had "no precedents in this country, as yet, to regulate the divisions in equity as in Great Britain; equity, therefore, in the supreme court for many years will be mere discretion."  Letters from The Federal Farmer No. 3 (Oct. 10, 1787), in 2 The Complete Anti-Federalist at 244.

associated with the lack of a reporting system and worked to assure more systematic reporting, judges and lawyers of the day recognized the authority of unpublished decisions even when they were established only by memory or by a lawyer's unpublished memorandum. Karsten, Heart Versus Head 30; Jesse Root, The Origin of Government and Laws in Connecticut (1798), reprinted in The Legal Mind in American 38-39 (Perry Miller ed., 1962).[14]

To summarize, in the late eighteenth century, the doctrine of precedent was well-established in legal practice (despite the absence of a reporting system), regarded as an immemorial custom, and valued for its role in past struggles for liberty. The duty of courts to follow their prior decisions was understood to derive from the nature of the judicial power itself and to separate it from a dangerous union with the legislative power. The statements of the Framers indicate an understanding and acceptance of these principles. We conclude therefore that, as the Framers intended, the doctrine of precedent limits the "judicial power" delegated to the courts in Article III. No less an authority than Justice (Professor) Joseph Story is in accord. See his Commentaries on the Constitution of the United States §§ 377-78 (1833):

---

[14]In this, they were following the common-law view, which considered entry on the official court record sufficient to give a decision precedential authority whether or not the decision was subsequently reported. See, e.g., Coke, 2 Institutes, Proeme, last paragraph (stating that judicial decisions are reliable authority whether they are published, i.e., "related and reported in our Bookes," or only "extant in judicial Records . . .."). This remained true even after reporting became more systematic. See James Ram, Science of Legal Judgement (1834) ("A manuscript note of a case is authority. It may be more full, or accurate, than a printed report of the same case. The existence of such manuscript may be little known. When cited by a party in a cause . . . it may be 'an authority precisely applicable' (18 Ves. 347); but the opposite party, or the Court, may never have heard of it before; it may then come as a great surprise upon both.").

The case is not alone considered as decided and settled; but the principles of the decision are held, as precedents and authority, to bind future cases of the same nature. This is the constant practice under our whole system of jurisprudence. Our ancestors brought it with them, when they first emigrated to this country; and it is, and always has been considered, as the great security of our rights, our liberties, and our property. It is on this account, that our law is justly deemed certain, and founded in permanent principles, and not dependent upon the caprice or will of judges. A more alarming doctrine could not be promulgated by any American court, than that it was at liberty to disregard all former rules and decisions, and to decide for itself, without reference to the settled course of antecedent principles.

This known course of proceeding, this settled habit of thinking, this conclusive effect of judicial adjudications, was in the full view of the framers of the constitution. It was required, and enforced in every state in the Union; and a departure from it would have been justly deemed an approach to tyranny and arbitrary power, to the exercise of mere discretion, and to the abandonment of all the just checks upon judicial authority.

## III.

Before concluding, we wish to indicate what this case is not about. It is not about whether opinions should be published, whether that means printed in a book or available in some other accessible form to the public in general. Courts may decide, for one reason or another, that some of their cases are not important enough to take up pages in a printed report. Such decisions may be eminently practical and defensible, but in our view they have nothing to do with the authoritative effect of any court decision. The question presented here is not whether opinions ought to be published,

but whether they ought to have precedential effect, whether published or not. We point out, in addition, that "unpublished" in this context has never meant "secret." So far as we are aware, every opinion and every order of any court in this country, at least of any appellate court, is available to the public. You may have to walk into a clerk's office and pay a per-page fee, but you can get the opinion if you want it. Indeed, most appellate courts now make their opinions, whether labeled "published" or not, available to anyone on line. This is true of our Court.

Another point about the practicalities of the matter needs to be made. It is often said among judges that the volume of appeals is so high that it is simply unrealistic to ascribe precedential value to every decision. We do not have time to do a decent enough job, the argument runs, when put in plain language, to justify treating every opinion as a precedent. If this is true, the judicial system is indeed in serious trouble, but the remedy is not to create an underground body of law good for one place and time only. The remedy, instead, is to create enough judgeships to handle the volume, or, if that is not practical, for each judge to take enough time to do a competent job with each case. If this means that backlogs will grow, the price must still be paid. At bottom, rules like our Rule 28A(i) assert that courts have the following power: to choose for themselves, from among all the cases they decide, those that they will follow in the future, and those that they need not. Indeed, some forms of the non-publication rule even forbid citation. Those courts are saying to the bar: "We may have decided this question the opposite way yesterday, but this does not bind us today, and, what's more, you cannot even tell us what we did yesterday." As we have tried to explain in this opinion, such a statement exceeds the judicial power, which is based on reason, not fiat.

Finally, lest we be misunderstood, we stress that we are not here creating some rigid doctrine of eternal adherence to precedents. Cases can be overruled. Sometimes they should be. On our Court, this function can be performed by the en banc Court, but not by a single panel. If the reasoning of a case is exposed as faulty, or if other exigent

circumstances justify it, precedents can be changed. When this occurs, however, there is a burden of justification. The precedent from which we are departing should be stated, and our reasons for rejecting it should be made convincingly clear. In this way, the law grows and changes, but it does so incrementally, in response to the dictates of reason, and not because judges have simply changed their minds.

## IV.

For these reasons, we must reject Ms. Anastasoff's argument that, under 8th Cir. R. 28A(i), we may ignore our prior decision in <u>Christie</u>. Federal courts, in adopting rules, are not free to extend the judicial power of the United States described in Article III of the Constitution. <u>Willy v. Coastal Corp.</u>, 503 U.S. 131, 135 (1992). The judicial power of the United States is limited by the doctrine of precedent. Rule 28A(i) allows courts to ignore this limit. If we mark an opinion as unpublished, Rule 28A(i) provides that is not precedent. Though prior decisions may be well-considered and directly on point, Rule 28A(i) allows us to depart from the law set out in such prior decisions without any reason to differentiate the cases. This discretion is completely inconsistent with the doctrine of precedent; even in constitutional cases, courts "have always required a departure from precedent to be supported by some 'special justification.' " <u>United States v. International Business Machines Corp.</u>, 517 U.S. 843, 856 (1996), quoting <u>Payne v. Tennessee</u>, 501 U.S. 808, 842 (1991) (Souter, J., concurring). Rule 28A(i) expands the judicial power beyond the limits set by Article III by allowing us complete discretion to determine which judicial decisions will bind us and which will not. Insofar as it limits the precedential effect of our prior decisions, the Rule is therefore unconstitutional.

Ms. Anastasoff's interpretation of § 7502 was directly addressed and rejected in Christie.[15]  Eighth Cir. R. 28A(i) does not free us from our obligation to follow that decision.  Accordingly, we affirm the judgment of the District Court.

HEANEY, Circuit Judge, concurring.

I agree fully with Judge Arnold's opinion.  He has done the public, the court, and the bar a great service by writing so fully and cogently on the precedential effect of unpublished opinions.  I write separately only to state that in my view, this is a case which should be heard en banc in order to reconsider our holding in Christie, and thus resolve an important issue.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

_____

[15]On July 28, 2000, the Second Circuit decided Weisbart v. United States Dep't of Treasury, 2000 WL 1041231 (2d Cir. July 28, 2000).  Weisbart appears to conflict with Christie.  We express no view on whether we would follow Weisbart if it were not for the conclusive effect of Christie.