Albert K. SCHAAF and Patricia
Z. Schaaf, H/W, Appellants,

v.

Stephen E. KAUFMAN, M.D., Gastroin-
testinal Associates, Inc., and William
S. Haaz, M.D., Appellees.

Superior Court of Pennsylvania.

Argued Feb. 4, 2004.
Filed April 22, 2004.
Reargument Denied June 28, 2004.

J. Craig Currie, Philadelphia, for appellants.

Michael E. McGilvery, for appellees.

Before: KLEIN, McCAFFERY and OLSZEWSKI, JJ.

OPINION BY KLEIN, J.:

¶ 1 In a medical malpractice case, Patricia Z. Schaaf appeals the judgment entered on a defense verdict in favor of William S. Haaz, M.D. We affirm.

¶ 2 Albert Schaaf was scheduled to have a colonoscopy on June 10, 1998, which revealed bowel cancer from which he ultimately died. Three days before the colonoscopy, on June 7, 1998, Mr. Schaaf slurred his words while reading to his wife, Patricia Schaaf ("plaintiff"). Mr. Schaaf discussed the problem with his cardiologist, Dr. Haaz. Dr. Haaz allegedly committed negligence by not recognizing that Mr. Schaaf had suffered atrial fibrillation, and therefore did not take proper steps to prevent a stroke that occurred after the colonoscopy. At trial, Dr. Haaz's expert testified that the doctor's treatment of Mr. Schaaf was within the standard of care and was not negligent, and that is what the jury found.

¶ 3 Schaaf claims five errors that require a new trial. However, none has merit, and we will affirm.

¶ 4 Before we discuss the merits of the case, we digress to grant the defense motion to strike from appellant's

brief any mention of our memorandum decision in *Gould v. Scheiner*, 970 EDA 2001, 823 A.2d 1032 (Pa.Super. filed March 18, 2003) (unpublished memorandum). Citing our memorandum decisions is prohibited by Superior Court Internal Operating Procedure (IOP) § 65.37(A): "An unpublished memorandum decision shall not be relied upon or cited by a Court or a party in any other action or proceeding...." 210 Pa.Code § 65.37.

¶ 5 Section 65.37(A) in effect embodies two rules. It prohibits parties and courts from citing our memorandum decisions (the "no citation" rule).[1] It also declares that our memorandum decisions bind no party or court (the "non-binding" rule). Schaaf argues that both the no citation rule and the non-binding rule violate the Vesting Clause in Article V, section 1 of the Pennsylvania Constitution. Schaaf further argues that these rules violate the Due Course of Law Clause of Article I, section 11 of the Pennsylvania Constitution.[2] We reject both challenges.[3]

¶ 6 We have found no case determining whether IOP 65.37(A) may be enforced under the Pennsylvania Constitution. We first address Schaaf's argument that IOP 65.37 violates the Vesting Clause in Article V, section 1. That section of the Constitution states:

> The judicial power of the Commonwealth shall be vested in a unified judicial system consisting of the Supreme Court, the Superior Court, the Commonwealth Court, courts of common pleas, community courts, municipal and traffic courts in the City of Philadelphia, such other courts as may be provided by law and justices of the peace. All courts and justices of the peace and their jurisdiction shall be in this unified judicial system.

¶ 7 To support her argument, plaintiff relies on a decision of the United States Court of Appeals for the Eighth Circuit that held that prohibiting citations to memorandum opinions was unconstitutional under the similar clause in the United States Constitution.[4] *Anastasoff v. United*

---

1. We use the phrase "memorandum decision" to mean non-binding, non-citable decisions of an appellate court.

2. Other challenges can arguably be made under other sections of the Pennsylvania Constitution, such as Article I, section 9. And we are aware commentators have found support for their arguments against memorandum decisions in the United States Constitution. *See* Norman R. Williams, *The Failings of Originalism: The Federal Courts and the Power of Precedent*, 37 U.C. Davis L.Rev. 761, 765 (Feb. 2004) (*"Failings of Originalism"*). Schaaf has not raised any of these arguments (some of which would not apply), and we express no opinion on them.

3. Schaaf has not performed the analysis our Supreme Court urged on appellants who raise Pennsylvania constitutional arguments. In *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887 (1991), the Supreme Court stated that when raising a claim under the Pennsyl-

vania Constitution, "[A]s a general rule it is *important* that litigants brief and analyze at least the following four factors: 1) text of the Pennsylvania constitutional provision; 2) history of the provision, including Pennsylvania case-law; 3) related case-law from other states; 4) policy considerations, including unique issues of state and local concern, and applicability within modern Pennsylvania jurisprudence." 586 A.2d at 895 (emphasis added). However helpful these factors are, they are not mandatory. So long as the brief is otherwise sufficient, we will address the constitutional question. *Commonwealth v. White*, 543 Pa. 45, 669 A.2d 896, 899 (1995). Although we observe that following *Edmunds* not only aids appellate review but makes for a stronger argument, we do not find waiver on this ground.

4. The Vesting Clause of Article III, section 1 of the United States Constitution provides: "The judicial Power of the United States, shall be vested in one supreme Court, and in such

*States,* 223 F.3d 898 (8th Cir.2000), *vacated as moot,* 235 F.3d 1054 (8th Cir.2000).

¶ 8 Schaaf's reliance is misplaced. In *Anastasoff,* the plaintiff, a taxpayer, was seeking a refund from the Internal Revenue Service. A three-judge panel of the Eighth Circuit initially affirmed the district court's order granting the government summary judgment. In doing so, the panel declared unconstitutional the Eighth Circuit's rule rendering unpublished opinions nonbinding and forbidding parties and courts from citing them.

¶ 9 The Eighth Circuit looked at a wide range of historical and contemporary sources and penned a scholarly opinion. It first explained the doctrine of precedent as the duty to follow prior cases' declarations of the law to the extent they were necessary for the earlier decision. It then concluded that at the time the United States Constitution was written, the Founders considered the doctrine of precedent part and parcel of judicial power and intended it as a limitation on the federal judiciary's exercise of its power. 223 F.3d at 900.

■ ¶ 10 The Eighth Circuit then agreed to take the case *en banc.* By the time the case came up for rehearing, however, the IRS had agreed to pay the taxpayer her money, which rendered the case moot and the federal courts without jurisdiction. The *en banc* court vacated the panel's decision and explained that the is-

sue was still open in Eighth Circuit. 235 F.3d at 1056. Of course, the *Anastasoff* panel opinion still stands as a precedent of sorts—it just is no longer a binding precedent in the Eighth Circuit (or anywhere else).[5]

¶ 11 Nonetheless, we disagree that the Pennsylvania Constitution does not allow memorandum decisions—that is, judicial decisions that are non-binding and noncitable, except to the extent the rules surrounding the law of the case doctrine require.

■ ¶ 12 The "judicial power" referred to in Pennsylvania's Vesting Clause is simply the power to decide cases. That is all. Certainly we operate within the common law custom of judicial lawmaking, but that does not mean that we must make law (beyond the case at bar, that is) every time we make a decision. Stated differently, just because the "judicial power" we have been given includes the power to make law does not mean we must exercise that power in every case.

. ¶ 13 An example bears this out. Our Supreme Court frequently enters *per curiam* orders affirming or reversing the courts below. *See, e.g., Gwin v. Merkin,* No. 107 MAL 2003, 843 A.2d 380 (Pa. filed March 2, 2004). However, those orders lack anything beyond law-of-the-case effect. *Commonwealth v. Tilghman,* 543 Pa.

inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. art. III, § 1.

**5.** The word "precedent" has two meanings, which sometimes causes confusion. It can mean any case that stands for a particular principle, whether the case controls the outcome of a particular matter or not. *See, e.g., Jones, v. Superintendent, Va. State Farm,* 465 F.2d 1091, 1094 (4th Cir.1972) ("[A]ny decision is by definition a precedent...."). "Precedent" also means a decision that "must be followed when similar circumstances

arise." Black's Law Dictionary (7th ed.1999). Confusion ensues when writers use the word "precedent" and it is unclear which meaning was intended. *See, e.g., Failings of Originalism,* 37 U.C. Davis L.Rev. at 776 (criticizing Fourth Circuit's opinion in *Jones* as "far from a model of clarity" because opinion stated memorandum decisions are precedent but not "precedent within the meaning of the rule of stare decisis."). In an attempt to be clear, we will specify which meaning we mean by using the phrases "binding precedent" and "nonbinding precedent," as applicable, or another clear phrase.

578, 673 A.2d 898, 904–5 (1996) ("[W]e did not *sub silentio* overrule [*Commonwealth v. Harris,* 423 Pa.Super. 190, 620 A.2d 1175 (1993)] by our *per curiam* order of affirmance in *Abraham* [*v. Dep't of Corr. of Pa.,* 150 Pa.Cmwlth. 81, 615 A.2d 814 (1992)].")*. See also Commonwealth v. Nobalez,* 805 A.2d 598, 601–2 (Pa.Super.2002).

¶ 14 Yet no one could reasonably claim that in issuing those orders, the Supreme Court was acting in anything other than a judicial capacity within the common law model. Those orders decided cases, and although they did not declare law binding in other unrelated cases, they fall within the common law model as cases decided by adversarial procedures and following previous decisions. *See, e.g., Commonwealth v. Ceo,* 652 EAL 2002, 845 A.2d 199 (Pa. filed Feb. 24, 2004).

¶ 15 We have found no appellate court decision adopting *Anastasoff*'s reasoning. In fact, the trend is just the opposite. The leading criticism was iterated by Judge Alex Kozinski of the Ninth Circuit:

Unlike the *Anastasoff* court, we are unable to find within Article III of the Constitution a requirement that all case dispositions and orders issued by appellate courts be binding authority. On the contrary, we believe that an inherent aspect of our function as Article III judges is managing precedent to develop a coherent body of circuit law to govern litigation in our court and the other courts of this circuit. We agree with *Anastasoff* that we—and all courts—must follow the law. But we do not think that this means we must also make binding law every time we issue a merits decision. The common law has long recognized that certain types of cases do not deserve to be authorities, and that one important aspect of the judicial function is separating the cases that should be precedent from those that

should not. Without clearer guidance than that offered in *Anastasoff,* we see no constitutional basis for abdicating this important aspect of our judicial responsibility.

*Hart v. Massanari,* 266 F.3d 1155, 1180 (9th Cir.2001).

¶ 16 Moreover, it is not clear that the view of history *Anastasoff* rests on has as strong a foundation as it purports. *See Hart,* 266 F.3d at 1175; *Failings of Originalism,* 37 U.C. Davis L.Rev. at 805–813. We do not need to enter this debate, because even if *Anastasoff*'s analysis version of history is accurate, it still puts the accent on the wrong beat.

¶ 17 History is just that—an account of the past. Whatever guidance they might offer, past practices were designed for past conditions. History is not a straightjacket. In the end, the *Anastasoff* line of reasoning essentially works backwards from an account of what judges once did, to find within the grant of judicial power a requirement to act within that view of what judges should do. This is no answer. The real issue is what the Constitution—a basic outline of government, not a code of laws—means today, giving due consideration to past, present, and possibly unforeseen future, circumstances.

¶ 18 In the centuries since William Penn founded the colony, things have changed significantly. Modern courts (particularly state courts) are faced with an overwhelming crush of cases where the common law appellate courts had a much lighter docket. In the 13 years between the founding of the Superior Court in 1895 and 1908, we decided 4,991 appeals. *See* Hon. Patrick R. Tamilia & John J. Hare, *Keystone of Justice: The Pennsylvania Superior Court* 88 (2000).

¶ 19 In recent years, we have adjudicated a similar number in a single year. In

2003, although the number of commissioned judges had slightly more than doubled from seven to 15, the increase in cases was far greater: Last year, we rendered 5,272 decisions. Whatever the common law courts thought they had to do does not tell us very much about what our Constitution requires us to do now under such drastically different circumstances. And it is inherent in the common law model that judges be able to adapt, change, or even discard old rules as needed to fit changed circumstances, including to what degree their decisions are authoritative, binding, or properly referenced.

¶ 20 It is true that there is a substantial body of opinion that believes that counsel should be able to refer to memorandum decisions, not as binding precedent, but for their reasoning, as one would refer to an opinion from another state or a federal court. Other options are available, but regardless of which is "best," we believe our current practice passes constitutional muster.[6]

¶ 21 As things stand, the number of cases we review prevents us, as a practical matter, from writing each decision with sufficient attention to the wording for all of them to be binding law. Although we give every case the attention necessary to render a decision, we cannot draft each decision with as great of care. The wording of an opinion is nearly as important as the holding, since it will guide future cases. If every case were published, either the wheels of justice would be slowed intolerably or an innumerable amount of unintended loopholes would be created. Rather than generating additional, unnecessary litigation, memorandum decisions are a useful, although admittedly not ideal, tool for deciding cases while maintaining control of our time and the development of the law.

¶ 22 There is also some concern that a system where some decisions are published in bound reporters and others not, but all are deemed binding, would unfairly disadvantage the small practitioner and even more so, the *pro se* litigant. The wealthier law firms would be able to develop huge databases of our unpublished cases, while the smaller or less well-off firms would not. This situation would not be alleviated by the modern on-line databases such as Westlaw and LexisNexis. Again, only those with the funds to pay for the access would be able to survey the unpublished decisions. And this says nothing of the time required to wend through the bottomless pit of cases or what such research would cost. The time factor similarly militates against publishing all our decisions in bound reporters.

¶ 23 For all of these reasons, we conclude that IOP 65.37 does not violate Article V, section 1 of our Constitution. So long as we render judgments, whether in published, binding, citable opinions or not, we have not strayed beyond the judicial power we have been granted.

■ ¶ 24 Schaaf also asserts that the "no citation" and "not binding" rules in IOP 65.37 violate the Due Course of Law Clause found in Article I, section 11. That section of our Constitution provides:

> All courts shall be open; and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice administered without sale, denial or delay. Suits may be brought

---

6. Our sister court, the Commonwealth Court, handles memorandum decisions somewhat differently. Although *its* memorandum decisions are also non-citable and non-binding, see 210 Pa.Code § 67.55, the memorandums are signed and made available for 90 days on the Internet. *See* http://www.aopc.org/OpPosting/index/CWealthunpublished.asp.

against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct.

¶ 25 However, Schaaf offers no explanation of how IOP 65.37 runs afoul of the Due Course of Law Clause, and we will not make arguments for her. Unless the parties properly develop their arguments, our review is potentially hampered and the adversarial system does not work. We therefore find this argument waived.[7] *Commonwealth v. LaCava,* 542 Pa. 160, 666 A.2d 221, 235 (1995) (failure to sufficiently explain claim waives consideration of claim).

¶ 26 We add a final word to respond to Schaaf's contention that even if IOP 65.37 can constitutionally prevent citing our memorandum decisions to this Court, it does not apply in other courts. She points to a notation printed at the beginning of our IOPs that states in relevant part that the IOPs apply to proceedings in our Court:

> Implementing Pa.R.A.P. 3501–3517, the Superior Court of Pennsylvania, pursuant to Pa.R.A.P. 104 has adopted these internal operating procedures pertaining to appeals before the Court.

¶ 27 However, Shaaf ignores the actual wording of the specifically applicable IOP:

> An unpublished memorandum decision shall not be relied upon or cited by a Court or a party *in any other action or proceeding,* except that such a memorandum decision may be relief upon or cited (1) when it is relevant under the doctrine of law of the case, res judicata, or collateral estoppel, and (2) when the memorandum is relevant to a criminal action or proceeding because it recites issues raised and reasons for a decision affecting the same defendant in a prior action or proceeding.

IOP § 65.37(A) (emphasis added).

¶ 28 When two provisions in rules or statutes conflict, if one provision is a general rule and the other specifically applies to the problem at hand, the hornbook rule is that the specific provision controls over the general one. For this reason, our generalization that our IOPs apply only to cases before us is of no matter, because IOP 65.37(A) specifically states that "[a]n unpublished memorandum decision shall not be relied upon or cited by a Court or a party in any other action or proceeding ...." Because IOP 65.37 is the narrower, more specialized rule, Judge Gary Glazer correctly admonished Shaaf for citing our memorandum decision in the court below. *Cf. Goldey v. Tr. of Univ. of Pa.,* 544 Pa. 150, 675 A.2d 264, 266 n. 1 (1996) (noting that memorandum decisions from Superior Court may not be cited per IOP 65.37).

¶ 29 The motion to strike is granted and we turn to the substantive issues.

**1. The omission of a portion of the "irrelevant considerations" jury charge does not require reversal.**

¶ 30 Plaintiff claims error because Judge Glazer omitted a portion of Suggested Standard Jury Instruction (Civil) § 10.07.[8] The omitted portion of the in-

---

7. To the extent that she would argue that memorandum decisions are fundamentally unfair, we would disagree. Certainly courts in civil law jurisdictions would disagree. Judges there typically may not make law at all and decisions of even the highest court are generally non-binding, sometimes even on remand. And even some common law courts in this country write short, pithy opinions that recite little or nothing about the facts of the case, which makes their opinions virtually uncitable in future cases.

8. The suggested instruction reads in full:

A medical malpractice case is a civil action for damages and nothing more. You must

struction states, "[t]he claim does not involve the defendant's reputation, his medical practice, or his rights as a licensed physician."

¶ 31 The omitted language has been in the draft standard charge for years. However, many questioned the propriety of that part of the instruction after Congress passed the Health Care Quality Improvement Act of 1986 ("the Act"), 42 U.S.C.A. § 11101–11152. The Act generally requires insurance companies to report to the federal government any payments they make to settle a medical malpractice claim or satisfy a judgment arising from a malpractice case. 42 U.S.C.A. § 11131.

¶ 32 Questions about the irrelevant considerations jury instruction arose because the Act also requires the information on malpractice payments to be reported to state licensing boards. 42 U.S.C.A. § 11134(c). This meant that it was possible that a verdict against a doctor in a medical malpractice case *could* affect the doctor's practice.

■ ¶ 33 At first, some judges gave the full irrelevant considerations charge but also told the jury about the reporting requirement of the Act. However, in *Levine v. Rosen*, 532 Pa. 512, 616 A.2d 623 (1992), the Supreme Court prohibited that practice. Nonetheless, *Levine* did not mandate any specific way to urge the jury to focus on the issues legitimately in the case, rather than on irrelevant considerations. This is unsurprising, since the law has long been that the trial court need not use specific language to instruct the jury, so

long as it accurately explains the law. *See Vallone v. Creech*, 820 A.2d 760, 764 (Pa.Super.2003). After all, they are only *suggested* instructions.

¶ 34 In this case, the jury instruction was proper and Judge Glazer did not commit reversible error by omitting part of the instruction. Judge Glazer did not err because he did give the first and last parts of the instruction, which tell the jury the case is about negligence and to ignore other, irrelevant considerations. He said:

> A medical malpractice is case [sic] is a civil action and nothing more. The sole issue is whether the plaintiff has suffered injuries as a result of the defendant's negligence and is thus entitled to monetary compensation for those injuries.
>
> This case does not involve punishment of the physicians or even criticism of their professional abilities beyond the facts of this case. Therefore, no thought whatsoever should be given to these irrelevant considerations when reaching a verdict in this case.

(N.T., 11/22/03 at 20.) Because Judge Glazer informed the jury that the only issue was whether the defendant was negligent, and that the jury had to disregard other, irrelevant considerations, the instruction was proper.

¶ 35 In fact, not giving the full charge is reasonable, since some of the jurors may know about the reporting requirement and know that an adverse verdict might affect the doctor. Telling jurors something they

decide only the issue of whether the plaintiff has suffered injuries as the result of the defendant's negligence, and is thus entitled to monetary compensation for those injuries. This case does not involve punishment of the defendant, or even criticism of [his][her] professional abilities, beyond the facts of this matter. The claim must be decided by you on the basis that it does not involve the defendant's reputation, [his][her] medical practice, or [his][her] rights as a licensed physician. Therefore, no thought should be given to these irrelevant considerations in reaching your verdict.
Pa. SSJI (Civ.) § 10.07.

believe is incorrect could cause difficulties in deliberations.

¶ 36 It is on this issue that Schaaf would cite our memorandum decision in *Gould, supra.* Even if that decision were binding, we would reach the same result. In that case, although the trial court told the jury that the case "does not involve punishment of the defendant, or even criticism of his professional abilities, beyond the facts of this matter," it did not give the rest of the instruction. Specifically, it omitted the sentence, "Therefore, no thought should be given to these irrelevant considerations in reaching a verdict in the case." We reversed because the judge omitted "the basic thrust" of the instruction: The jury must ignore irrelevant considerations. Here, because Judge Glazer informed the jury of the instruction's "basic thrust," we reach a different result.

### 2. The exclusion of testimony that Dr. Haaz "apologized" was harmless error.

¶ 37 Schaaf testified that when she complained about her husband's slurred speech, Dr. Haaz told her she was "just looking for trouble." Once her husband suffered a stroke, she testified that she confronted Dr. Haaz and said, "I guess I wasn't looking for trouble." Schaaf also testified that Dr. Haaz said he was sorry. When Schaaf's sister, Ms. Cook, took the stand, plaintiff's counsel made an offer of proof that she would testify that Dr. Haaz said he apologized once, and said he was sorry twice. Counsel did not say whether Ms. Cook would say anything further that would clarify whether Dr. Haaz meant that he was at fault or that he was sad that Mr. Schaaf had suffered a stroke.

¶ 38 Since exactly what Ms. Cook would have said is important, rather than counsel stating what he believed she would say, it would have been better if counsel had elicited Ms. Cook's testimony from Ms. Cook herself, or at least provided an affidavit with post-trial motions. As it stands, we do not know if Ms. Cook would have elaborated in such a way that it would be clear that Dr. Haaz meant he was at fault. This would have been a simple matter because Judge Glazer had sent the jury out of the room and Ms. Cook was on the stand. If counsel had done this (or at least included an affidavit from Ms. Cook of what she would say in post-trial motions), both Judge Glazer and the appellate courts would have had a more complete record. In any event, Judge Glazer sustained an objection that Ms. Cook's testimony would be "prejudicial."

¶ 39 At most, excluding Ms. Cook's testimony was harmless error.[9] Saying "I apologize" or "I'm sorry," without more, is ambiguous. It is not clear whether the doctor was apologizing for his remark to Schaaf, about the sad situation, or for making a mistake. One can be sorry about or apologize for an event without meaning to say one was at fault. For example, when hearing that someone's relative has died, it is common etiquette to say, "I'm sorry," but no one would take that as a confession of having caused the death.

¶ 40 In this case, if counsel had made a more complete offer of proof, or had interviewed the witness on the record but out of the jury's presence, we might know that Ms. Cook would have said something that would make it clear that Dr. Haaz was in fact admitting fault. But that would be a different case. As the record stands, we

---

9. We review orders excluding evidence for abuse of discretion. *Ettinger v. Triangle–Pacific Corp.,* 799 A.2d 95, (Pa.Super.2002).

cannot say that her testimony would have added anything beyond what Mrs. Schaaf had already said. Because her testimony would apparently not have added new information, any error in excluding it was harmless.

### 3. A tipstaff erroneously telling the jury that a deposition would not be read back to them, before the judge had a chance to rule on the issue, was harmless error.

¶ 41 Plaintiff claims that the jury asked for a portion of the testimony to be read back, and before the judge had a chance to rule, the jury came back with a verdict. Plaintiff claims that meanwhile the tipstaff erroneously told the jury the deposition would not be read back.

¶ 42 Plaintiff contends that she was misinformed about the jury's question. She asserts that she was told during a phone conference and during an on-the-record discussion that the jury wanted to have the decedent's entire deposition about the conversation after the colonoscopy. She asserts that after trial she learned from two jurors that the jury actually wanted to "see or hear the transcript or testimony of Albert Schaaf in connection with his conversation with Dr. Haaz on June 8, 1998." (Appellant's brief at 28.) She also argues that because of the way the information was conveyed, she had the impression that while the judge was considering how to respond to the question, the jury returned a verdict. On post-trial motions, Judge Glazer refused to grant a new trial on these grounds.

¶ 43 The decision of a trial judge to read back part of the record, be it a deposition or something else, is a matter of discretion. Since we would not have reversed the trial judge if he refused to allow the deposition to be read back, we cannot say that even if the events transpired as

plaintiff claims, there would have been error to refuse to read it again, since the evidence was presented at trial. *Cf. Orndoff v. Wilson,* 760 A.2d 1 (Pa.Super.2000) (holding information jury obtained from source outside trial not grounds for new trial because information was already before jury). Like the previous allegation of error, this one, too, was at most harmless.

### 4. The trial court properly instructed the jury that doctors are not liable for mere mistakes or errors of judgment.

¶ 44 Schaaf also argues that the trial judge erred by not properly instructing the jury on the "error in judgment" defense. Judge Glazer's instructions included the following:

> Professional negligence consists of a careless or unskilled performance by a physician of the duties imposed on him or her by their professional relationship with their patient. It is also negligence when a physician shows a lack of proper care, evaluation and skill in the performance of a professional act. However doctors are not liable for mistakes or errors in judgment, nor do they guarantee a result.

(N.T., 1/22/03, at 22.)

¶ 45 Schaaf claims the instructions as given were confusing and misleading without the following additional instructions:

1. A mere mistake in judgment is not a defense for a physician in a case like this unless the physician can demonstrate that he employed the required judgment and care in arriving at his diagnosis, albeit erroneous.

2. If a physician, as an aid to his diagnosis, does not avail himself of the scientific means and facilities open to him for the collection of the best factual data upon which to arrive at his diagnosis,

the result is not a mere error of judgment but negligence in failing to secure an adequate factual basis upon which to support his diagnosis.

 ¶ 46 We disagree. As we stated above, the trial court does not have to use any particular wording in instructing the jury, so long as the law is adequately explained. *See Vallone, supra.*[10] Here, Judge Glazer not only stated that doctors are not liable for mere mistakes in judgment, he immediately explained what they are liable for:

> Medical malpractice consists of a negligent, careless or unskilled performance by a physician of the duties imposed on them by their professional relationship with their patient. It is also medical malpractice when a physician shows a lack of proper care and skill in the performance of a professional act.
>
> The burden of proof in a medical malpractice case is upon the plaintiff to prove either that the physician did not possess or employ the required skill or knowledge or, that the physician did not exercise the care and judgment of a reasonable person in similar circumstances.

(N.T., 11/22/03 at 22–23.)

¶ 47 Read as a whole, the charge accurately reflects that doctors are liable if they deviate from the standard of care, but if a judgment turns out to be wrong the doctor cannot automatically be found negligent. Moreover, it is the plaintiff's proposed instructions that are misleading, not Judge Glazer's actual instruction. Plaintiff's instruction number 1 above is particularly misleading, in that it would put the burden on the defendant doctor to disprove non-negligence, which, as Judge Glazer properly explained to the jury, is not the law. It is for the plaintiff to prove negligence, not the other way around. We see no error.

**5. The trial court did not err by allowing defense expert Dr. Steven Meister to testify beyond the literal contents of his report.**

 ¶ 48 Schaaf argues that Judge Glazer erred by allowing Dr. Meister to state that Mr. Schaaf's stroke could have originated from problems in a number of parts of the body, such as the small vessels in the brain, other parts of the heart, rather than the atria, the big arteries, veins in the leg and pelvis, the septum of the heart, and from cancer. She argues this testimony was beyond the fair scope of Dr. Meister's report, which simply stated that the stroke was not the result of atrial fibrillation. We disagree.[11]

 ¶ 49 Dr. Meister's testimony was not beyond the fair scope of the report. An expert's testimony is within the fair scope of his or her report if the report sufficiently apprised the opposing party of the expert's theory such that the opponent can prepare a meaningful response. *Woodard,* 827 A.2d at 442. In this case, plaintiff could properly prepare because all Dr. Meister testified to were other, potential causes.

---

10. We will reverse for improper jury instructions only where the trial court committed a clear abuse of discretion or an error of law which controlled the outcome of the case. *Stecher v. Ford Motor Co.,* 779 A.2d 491, 493 (Pa.Super.2001). Or as the Commonwealth Court recently phrased it, "We will not reverse for isolated inaccuracies; the charge as a whole must be shown to have caused preju-

dicial error. Thus, to constitute reversible error, a jury instruction must be erroneous and harmful to the complaining party." *City of New Castle v. Uzamere,* 829 A.2d 763, 771 (Pa.Cmwlth.2003).

11. We review this question for abuse of discretion. *Woodard v. Chatterjee,* 827 A.2d 433, 440 (Pa.Super.2003).

¶ 50 Dr. Meister testified that he did not believe the stroke was the result of atrial fibrillation and stated why. He also listed other mechanisms as the possible cause. Obviously, *something* must have caused the stroke if not atrial fibrillation. One would expect that the plaintiff's experts would know the other possible causes as well as Dr. Meister and prepare accordingly. The expert is not required to give a basic primer on medicine in his or her report or draft it for a complete neophyte in the field. An expert is entitled to expect that the report will be read by qualified experts on the other side. Rather, he simply listed other possible causes. This was not beyond the fair scope of the report.

¶ 51 In conclusion, we hold that IOP 65.37 does not violate the Vesting Clause and that plaintiff waived the Due Course of Law Clause argument, grant the motion to strike, find Schaaf's issues meritless, and affirm the judgment.

¶ 52 Motion to strike granted. Judgment affirmed.