Brian A. ANINGAYOU, Appellant,

v.

STATE of Alaska, Appellee.

No. A–6177.

Court of Appeals of Alaska.

Dec. 5, 1997.

Kirsten Bey, Assistant Public Defender, Nome, and Barbara K. Brink, Public Defender, Anchorage, for Appellant.

Cynthia L. Herren, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before COATS, C.J., and MANNHEIMER and STEWART, JJ.

STEWART, Judge.

On a stipulated record, Judge Charles R. Tunley found Brian A. Aningayou guilty of sexual assault in the first degree.[1] Aningayou appeals, contending that the superior court erred by denying his motion to suppress statements he made to Alaska State Trooper Gary L. Johnson.

On April 29, 1995, E.M. was asleep in bed in her home in Gambell, a village on St. Lawrence Island. She awoke to the sound of breaking glass. She jumped out of bed, turned on the hallway light, and was immediately rushed and attacked by Aningayou, who was wearing a cap and a dark jacket and had apparently cut his hand on the glass. He grabbed her and started choking her. She struggled but was barely able to breathe. She bit him on the hand. He was enraged at her attempts at resistance. He threatened to kill her.

Aningayou removed his pants and her pajama bottoms. While continuing to assault her, choking her and maintaining his threats to kill her, Aningayou repeatedly penetrated her anally and vaginally, causing her excruciating pain.

E.M. noticed that "Sonics" was written on Aningayou's hat, which came off during the attack. She gave him the hat. Aningayou

---

1. The parties agreed to the dismissal of a separate count of first-degree burglary.

left telling her "I'll kill you if you press charges." E.M. never saw Aningayou's face and could not identify him.

In addition to injuries to her anal and vaginal areas, Aningayou's assault left E.M. with carpet burns on her elbows and knees, a split elbow, a damaged patella, bruises on her legs, on her arms, on her back, on her chest and on her face. She immediately telephoned for help.

Because of the weather, Troopers from Nome were not able to fly to Gambell. Troopers Barr and Johnson arrived the next day, April 30. They examined E.M.'s house. They found blood in the house and near the broken window. Based on their investigation and E.M.'s description of the rapist, the Troopers began looking for a Native male, 5′6″ to 5′7″ in height, not very skinny, with a "Sonics" ball cap, hair below the ears, and a cut on the arm or hand. The physical height and build were common for males in Gambell.

The Troopers started by trying to talk with people who had a "Sonics" ball cap. They spoke to several people who they thought had such a hat. Aningayou was among the group identified as having a "Sonics" hat. The Troopers talked to Aningayou. Aningayou told Trooper Johnson that he had traded his "Sonics" hat for whiskey the night before E.M. was attacked, but did not recall with whom he had traded. He had a cut on his hand, but stated that he had been in a four-wheeler accident. Johnson spoke with Aningayou a second time on the 30th. Like the first, the second contact was brief, cordial and non-confrontational. Although Aningayou had a cut and at one time had a "Sonics" hat, because of his slender build that did not match E.M.'s description of the rapist and the small size of the cut, Johnson did not suspect Aningayou of the attack but presumed that Aningayou knew who had the hat. The Troopers returned to Nome.

Trooper Johnson went back to Gambell alone. He tried to contact every male in the village. The Troopers were also checking airline manifests to contact individuals who had left the island. Johnson also contacted whaling crews that were returning to the village.

Prior to leaving the village a second time, Johnson initiated one more contact with Aningayou. He went to Aningayou's home wearing his utility uniform, essentially coveralls, and his sidearm. Aningayou indicated he was willing to talk with Johnson again. Aningayou preferred Johnson's suggestion to go to the magistrate's office which was private and empty. As a convenience, they both rode on a four-wheeler belonging to a village police officer to the magistrate's office which is on the second floor of the city office building roughly 100 yards from Aningayou's home. Aningayou finished a cigarette outside before following Johnson upstairs.

Johnson closed the office door for privacy since the building was busy with people using the building's other offices. The door was not locked. The room was accessible by the public because at one point in the interview, Aningayou's mother opened the door and talked to Johnson. Aningayou was not restrained. Johnson did not state specifically that he was free to go at any time, though at his house Aningayou heard Johnson tell his father that Aningayou was not a prime suspect, and that he was not looking to charge him. Aningayou agreed to have the conversation taped and clipped a microphone on his clothes.

Johnson thought Aningayou was protecting a third party. Aningayou stated he was at a party with friends on the Friday night before the assault, but would not identify the friends. Johnson warned Aningayou that he would be arrested for hindering prosecution if he was deliberately obstructing the investigation.

> And you've given me a line about your hat, it's not true, and I know it's not true. And I want to try to take care of that so I can quit bothering you. And you can get on with it. Because at this point . . . you're . . . holding up my investigation[.] [T]hat's going to hinder . . . prosecution and that's a crime. And you can be arrested for it. But I don't want to arrest you. I don't want you to get into trouble. I don't need to deal with you. But if you don't cooperate, I'm telling you right now that you can go to jail.

Aningayou responded "[i]f you turn this off I'll tell you," referring to the tape recorder.

Johnson thought Aningayou was concerned with "squealing," and tried to assure him that he would keep the tape confidential so his friends would not know that he provided information, but Johnson indicated that he needed a taped record in case Aningayou attempted to recant.

Aningayou responded "It's me." Johnson did not realize that Aningayou was identifying himself as the rapist, but quickly discovered that Aningayou was admitting he raped E.M.

Aningayou indicated that he would tell the truth if he was not manhandled, referring to a confrontation between Johnson and Aningayou's brother where the brother insulted Johnson with a racist remark and they shouted at each other. Johnson emphasized to Aningayou that he would not be manhandled, that he was not in custody, and that they were in the office only because it was quiet. He then advised Aningayou of his *Miranda*[2] rights. Aningayou indicated he understood those rights.

He then gave Johnson detailed information about breaking into E.M.'s house, sexually assaulting her, and disposing of his hat and gloves. At a point in the interview, Aningayou communicated that he did not want to say any more, but Johnson continued his questioning. Aningayou was arrested at the conclusion of the interview and transported out of the village. In Nome, Johnson conducted another brief interview with Aningayou after again advising him of his rights.

The superior court granted Aningayou's motion to suppress from the point in the interview when Aningayou said he did not want to say any more and Johnson continued to question him. However, the court ruled that Aningayou's statements prior to that time were not taken in violation of *Miranda*.[3] Additionally, the court ruled that Aningayou's statement was voluntary.

We review the superior court's determination that Aningayou's statement was voluntary by examining the totality of the circumstances surrounding the statement. *State v. Ridgely*, 732 P.2d 550, 554 (Alaska 1987). A finding of voluntariness presents a mixed question of law and fact requiring a three-step inquiry. First, the trial court must have found the external, historical facts surrounding the statement. Second, from these external facts, the court must have inferred an internal, psychological fact: the mental state of the defendant. Finally, the judge must have assessed the legal significance of this inferred mental state. *See Troyer v. State*, 614 P.2d 313, 318 (Alaska 1980).

The first step of the inquiry, determining historical fact, is fact-finding. The trial court must weigh the credibility of witnesses. Therefore, we must defer to the trial judge's findings of historical fact and overturn them only if they are clearly erroneous. *Id.* However, the appellate court has a duty to examine the entire record and make its own independent determinations as to the mental state of the accused and its legal significance. These determinations are to be based on the totality of the circumstances surrounding the confession. *Troyer*, 614 P.2d at 318, *Ridgely*, 732 P.2d at 554.

Aningayou did not attack the superior court's historical findings. Thus, we must reach an independent determination of Aningayou's mental state and the legal significance of that mental state. Factors that have to be considered are the age, mentality, and prior criminal experience of the defendant; the length, intensity and frequency of the questioning; the existence of physical deprivation or mistreatment; and the existence of threat or inducement. *See Sovalik v. State*, 612 P.2d 1003, 1006 (Alaska 1980).

Aningayou was a young man, almost twenty, when he was questioned in Gambell by Trooper Johnson. The record before the court does not present any issue of mental incapacity in general or at the time he was

---

**2.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**3.** The record does not reflect that the parties litigated or the superior court ruled on the legality of the interview at the Nome trooper office.

questioned. He had had minor contact with the juvenile system and had no adult criminal record. The final interview in Gambell was about an hour long. The prior contacts between Johnson and Aningayou were brief and non-confrontational. The Gambell interview was not particularly intense. There is no evidence of deprivation or physical maltreatment. Trooper Johnson offered no inducement in the legal sense. Arguably, the discussion of hindering prosecution was a threat.

However, after reviewing the record before this court, we conclude, as did the superior court, that the state sustained its burden of proof that the statements were voluntary. Reviewing the totality of the circumstances in the record before this court, we cannot conclude that Trooper Johnson's questioning overbore Aningayou's will. Aningayou himself testified that he wanted to tell the truth about the attack to somebody, that his parents or girlfriend were not available choices, and that the time was right to tell Trooper Johnson.

 Aningayou contends that he was in custody when Johnson was interviewing him in the city building and therefore he should have been advised of his *Miranda* rights. A determination of custody for *Miranda* purposes is an objective test: would a reasonable person believe he or she was not free to leave or break off questioning. *Hunter v. State*, 590 P.2d 888, 895 (Alaska 1979). The trial court must consider three groups of facts to answer the question. The first are facts inherent to the interrogation: the location and length of the interview, who was present, what the police and the defendant said and did, the presence of any physical restraint on the defendant or things equivalent to actual restraint (i.e., drawn weapons, a guard at the door), and whether the defendant was led to believe that he or she was being questioned as a suspect or as a witness. Events preceding the questioning are also relevant, especially how the defendant arrived at the interview site—whether he came on his own, in response to an officer's request, or escorted by police officers. Finally, what happened after the questioning is considered; whether the defendant left free-

ly, was detained or arrested. *Id.* We review the evidence in the light most favorable to upholding the superior court's decision. *Beagel v. State*, 813 P.2d 699, 704 (Alaska App.1991).

 Aningayou testified at the evidentiary hearing on the suppression motion that Johnson did not say anything that made him think he was not free to leave. He came to the city building at Johnson's request. As a matter of convenience, he got a ride on a four-wheeler belonging to a village police officer to the city building, but he went up to the magistrate's office unescorted. There were no actual or threatened physical restraints. Initially, Aningayou was told he was a potential witness, not a defendant. He was arrested after the interview.

 The paramount and ultimate question is whether there is a formal arrest or restraint on movement of the degree associated with formal arrest. *See Motta v. State*, 911 P.2d 34, 38 (Alaska App.1996). The examination of the circumstances of the questioning is objective, that is, from the point of view of a reasonable, innocent person. *See Long v. State*, 837 P.2d 737, 743 n. 1 (Alaska App.1992).

The superior court found that Aningayou was not in custody when he arrived at the magistrate's office within the city office building. Aningayou himself testified that nothing that Trooper Johnson said made him believe he was not free to leave the questioning. Furthermore, there was nothing about the setting or the circumstances surrounding the inception of the interview that rendered it custodial. We agree with the superior court that Aningayou was not in custody when the interview began.

However, Aningayou maintains that Johnson's "threatened arrest" establishes objectively that a reasonable person would not feel free to break off questioning or leave and thus the questioning was custodial interrogation requiring *Miranda* warnings. The superior court found that Trooper Johnson's discussion of Aningayou's potential liability for hindering prosecution was not a threat of arrest, based on the superior court's review of the tape recording of the interview.

Based on our review of the record, we conclude that this finding is clearly erroneous. Although Aningayou testified at the suppression hearing that Johnson had not said anything that made him feel restrained, and that he wanted to talk to someone about the rape, our analysis is an objective one. From that prospective, Trooper Johnson's threat to arrest Aningayou for hindering prosecution if Aningayou did not tell Johnson who had his "Sonics" hat was sufficient under the analysis of *Hunter* to require *Miranda* warnings irrespective of Johnson's subjective belief that Aningayou was not a suspect. We believe that a reasonable person in Aningayou's position would interpret Trooper Johnson's remarks as requiring Aningayou to respond concerning who had the hat. If a reasonable person in Aningayou's position did not respond, he could reasonably infer that he would be arrested for hindering prosecution. Although it appears that Trooper Johnson was questioning Aningayou as a witness and not as a suspect, at that point in the questioning, a reasonable person in Aningayou's position would not have felt he was free to leave or to break off questioning. *See Ed-* *wards v. State,* 842 P.2d 1281, 1285 (Alaska App.1992) (interviewee in custody under *Hunter* analysis when officer threatens arrest unless interviewee responds to officer's questioning). Therefore, we conclude that the statements made by Aningayou immediately after Johnson discussed Aningayou's culpability for hindering prosecution must be suppressed.

We must remand the case to the superior court for a determination under *Halberg v. State,* 903 P.2d 1090 (Alaska App.1995), as to which of Aningayou's ensuing statements were tainted by the initial *Miranda* violation and whether suppression of this evidence required above casts reasonable doubt on Aningayou's conviction. The judgment of the superior court is REMANDED and jurisdiction is retained.