**Virgil JOHN, Appellant,**

v.

**STATE of Alaska, Appellee.**

No. A–7252.

Court of Appeals of Alaska.

Nov. 16, 2001.

---

**36.** *See* Alaska Const. art. I, § 1.

Marcia E. Holland, Assistant Public Defender, Fairbanks, and Barbara K. Brink, Public Defender, Anchorage, for Appellant.

Kenneth M. Rosenstein, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

*OPINION*

STEWART, Judge.

This appeal requires us to construe Alaska Criminal Rule 18, the rule that specifies the proper site for holding trial in a criminal case. Virgil John was charged with committing a felony in Tetlin, a village located near Alaska's eastern border with Canada. Tetlin lies about twenty air miles from Tok, a town that the Alaska Supreme Court has designated as a suitable site for felony trials. But based on an interpretation of Rule 18 that this court adopted in *Wilson v. State*, 770 P.2d 1126,[1] the superior court scheduled John's trial in Fairbanks (over two hundred miles away), and the court refused John's later request to move the trial to Tok.

---

1. Memorandum Opinion and Judgment No. 1893 (Alaska App., October 11, 1989).

For the reasons explained here, we conclude that our *Wilson* decision is mistaken. Correctly interpreted, Criminal Rule 18 specifies Tok as the presumptive site for holding John's trial. Thus, John's later request to move the trial to Tok should have been granted. Because the superior court denied that request, we reverse John's conviction.

### The Alaska Supreme Court's decision in Alvarado, and the supreme court's effort to codify Alvarado in Criminal Rule 18

In *Alvarado v. State*,[2] our supreme court recognized the "profound cultural differences [that] exist between the Native villages and urban areas of Alaska."[3] Because of the "gulf which separates the mode of life of the typical Alaskan villager from the type of existence led by most residents of [the larger] cities of the state,"[4] the supreme court held that it was unlawful for juries drawn solely from those larger cities to decide the fate of defendants charged with committing crimes in rural villages. The court declared that the Alaska Constitution guarantees criminal defendants the right to have their jury selected from a pool that represents "a fair cross section of the community in which the crime occurred."[5]

Alaska Criminal Rule 18 was designed to implement the *Alvarado* decision. Pursuant to section (a) of this rule,[6] the Alaska Supreme Court drew a venue map that divides the state into twenty-five superior court venue districts, each centered around a city or town designated as a suitable site for felony trials.[7] Section (b) of Rule 18 then sets out a four-part formula for identifying the presumptive trial site for a crime committed in any given location in Alaska. Under Rule 18(b), the presumptive site for a criminal trial is:

(1) The existing court location;

(2) Nearest to the situs of the alleged crime;

(3) Within the venue district;

(4) That has a judge and facilities for either a six-person or twelve-person jury as is necessary to the case.

The supreme court's goal was that, by using Rule 18(b) in combination with the venue map, judges would be able to identify a presumptive trial site where the composition of the jury pool could be expected to satisfy *Alvarado*.

Subsections (c) and (d) of Rule 18 authorize the administrative director of the court system to augment the trial sites identified on the supreme court's venue map. Under Rule 18(c), the administrative director sets minimum standards for trial sites by evaluating such factors as the available courtroom facilities and the availability of transportation, housing, and food for the trial participants. Using these standards, the administrative director conducts an annual survey of towns and villages to see which ones meet these standards. The administrative director then publishes a list of additional trial sites, designating whether these additional sites are approved "for six-person juries [*i.e.*, district court trials], twelve-person juries [*i.e.*, superior court trials], or both."[8]

Although a defendant's presumptive trial site is still determined under Rule 18(b) (*i.e.*, is still selected from among the sites identi-

2. 486 P.2d 891 (Alaska 1971).

3. *Id.* at 894.

4. *Id.* at 899.

5. *Id.* at 903.

6. Criminal Rule 18(a) states: "**Venue Districts.** Districts establishing venue for all criminal cases shall be devised and promulgated by the supreme court in the form of a map. The map shall indicate venue district boundaries for each existing court location capable of holding six-person jury trials or both six and twelve-person jury trials."

7. The twenty-five superior court venue districts on the supreme court's map are:

*First Judicial District* (6):
Angoon, Juneau, Ketchikan, Petersburg, Sitka, Wrangell
*Second Judicial District* (3):
Barrow, Kotzebue, Nome
*Third Judicial District* (12):
Anchorage, Cordova, Dillingham, Glennallen, Homer, Kenai, Kodiak, Naknek, Palmer, Seward, Unalaska, Valdez
*Fourth Judicial District* (4):
Bethel, Delta Junction, Fairbanks, Tok

8. Alaska R.Crim. P. 18(d)(2).

fied on the supreme court's venue map), Rule 18(e) gives a defendant the right to ask for trial in another approved location if that location "is the community within the venue district . . . nearest the place where the alleged crime was committed." However, the defendant must exercise this right promptly or it is forfeited. The defendant must make the request "prior to or at the entry of a plea in felony cases, [and] within five days of the entry of a plea in misdemeanor cases."

Finally, subsection (f) provides a "safety valve" for unusual cases where the above rules still do not yield a trial site that complies with *Alvarado*. Rule 18(f) declares that if the trial site identified by subsections (a)-(e) "will not provide a petit jury [pool] which is a representative cross-section of the appropriate community," the court may specially designate an alternative jury pool using the rules set forth in Administrative Rule 15(b)-(c).

*Our decision in Wilson v. State, and why the superior court scheduled John's case in Fairbanks rather than Tok*

The defendant in this case, Virgil John, was charged with committing felonies in the village of Tetlin. On the supreme court's venue map, Tetlin lies within the Tok venue district, so it would seem that, initially, John's trial should have been scheduled in Tok. Instead, the superior court scheduled John's trial in Fairbanks.

In doing so, the superior court followed a long-standing practice in the Fourth Judicial District: setting all felony cases for trial in either Fairbanks or Bethel unless the defendant affirmatively requests a change of venue to another felony trial site closer to where the crime occurred. This practice appears to be based on the interpretation of Rule 18(b) that this court adopted in *Wilson v. State*.

The defendant in *Wilson* was charged with committing a felony in Delta Junction. On the supreme court's venue map, the town of Delta Junction is identified as a suitable site for superior court trials, and the Delta Junction venue district is drawn around the town. Nevertheless, with the acquiescence of the parties, the superior court scheduled Wilson's trial in Fairbanks. On the morning of trial, Wilson discharged his attorney, elected to proceed *pro se*, and demanded trial in Delta Junction. (He claimed that his attorney had never informed him that the trial would be held in Fairbanks.) The superior court refused to move the trial to Delta Junction.[9]

Although the superior court's action might have been affirmed under the theory that Wilson's motion was untimely, this court affirmed the superior court's ruling under another theory: we rejected Wilson's underlying premise that he was entitled to have his trial in Delta Junction in the first place.

As explained above, Criminal Rule 18(b)(4) states that a criminal trial should presumptively be held at the existing court location within the venue district "[having] a judge and facilities for either a six-person or twelve-person jury as is necessary to the case." In *Wilson*, this court interpreted clause (4) to mean "having a *resident* judge *of the appropriate level of court* and facilities for either a six-person or twelve-person jury as is necessary to the case."

As interpreted in *Wilson*, Criminal Rule 18(b) directs the superior court to initially set a felony case for trial at the closest existing court location that has a resident superior court judge. Fairbanks and Bethel are the only two cities within the Fourth Judicial District that have resident superior court judges. Fortified by *Wilson's* interpretation of Rule 18(b), the superior court followed the practice of scheduling all Fourth Judicial District felony trials either in Fairbanks or in Bethel, depending upon which city was closer to the site of the crime. This is how John's trial came to be scheduled in Fairbanks rather than Tok.

John's attorney did not object to the superior court's action, apparently because he believed the case would be resolved through a plea bargain rather than a trial. But several months later, when the parties could not reach a mutually acceptable plea bargain, John changed attorneys and announced that he would go to trial. At that time, John

**9.** *See Wilson,* Memorandum Opinion and Judgment No. 1893, p. 2.

asserted his rights under *Alvarado* and asked the superior court to move the trial to Tok. The superior court ruled that John's motion was untimely. Even though John argued that the *Alvarado* decision called for his trial to be held in Tok, the superior court believed that Rule 18(b)—the rule designed to codify *Alvarado*—called for John's trial to be held in Fairbanks. The superior court therefore viewed John's motion for change of venue as a request for an alternative trial site under Rule 18(e), and the court denied the request as untimely. (As explained above, Rule 18(e) states that a request for an alternative trial site in a felony case must be made by the time the defendant enters a plea.)

### Why we now conclude that the interpretation of Rule 18 in Wilson is wrong

As explained above, Rule 18(b) sets out a four-part test for identifying the presumptive site of a criminal trial:

(1) The existing court location;

(2) Nearest to the situs of the alleged crime;

(3) Within the venue district;

(4) That has a judge and facilities for either a six-person or twelve-person jury as is necessary to the case.

In *Wilson*, we focused on clause (4) and, in particular, the phrase "has a judge." Based on this phrase, we concluded that no court location could qualify as a presumptive trial site under Rule 18(b) unless it had a resident judge of the appropriate level of court (superior court for felonies, district court for misdemeanors).

At first blush, this may seem to be an obvious reading of the rule. But, on closer inspection, *Wilson's* interpretation of clause (4) appears to contradict clause (3). In addition, *Wilson's* interpretation of clause (4) leads to results that appear to be inconsistent with the supreme court's designation of felony trial sites on its venue map. Finally, and most important, *Wilson's* interpretation of clause (4) leads to results that are inconsistent with the supreme court's decision in *Alvarado*.

As we have already noted, the supreme court's venue map divides Alaska into twenty-five superior court venue districts, each one containing a city or town that the supreme court has designated as a suitable site for felony trials. Clause (3) of Rule 18(b) states that the presumptive trial site must be an existing court location "within the venue district." One would suppose that the phrase "within the venue district" means "within the venue district where the crime occurred." But if this is true, *Wilson's* interpretation of clause (4) brings it into conflict with clause (3).

Although there are twenty-five superior court venue districts, only half of them contain cities or towns with resident superior court judges.[10] If clause (3) of Rule 18(b) requires the presumptive trial site to be located in the same venue district as the crime, *Wilson's* interpretation of clause (4) ensures that this will not be true for crimes committed in half of the superior court venue districts in the state—the twelve venue districts where there is no resident superior court judge.

It is possible to resolve this conflict by interpreting clause (3) differently. Instead of reading clause (3) to mean that the presumptive trial site must be located in the venue district where the crime occurred, one could interpret the "venue district" provision of clause (3) as being the introductory clause to the "has a judge and facilities" language of clause (4). In other words, instead of requiring the presumptive trial site to be located in the same venue district as the crime, clause (3) would require the presumptive trial site

---

10. Here again are the twenty-five superior court venue districts. The thirteen districts containing cities or towns with resident superior court judges are underlined.

*First Judicial District* (6): Angoon, *Juneau, Ketchikan*, Petersburg, *Sitka*, Wrangell

*Second Judicial District* (3): *Barrow, Kotzebue, Nome*

*Third Judicial District* (12): *Anchorage*, Cordova, *Dillingham*, Glennallen, Homer, *Kenai, Kodiak*, Naknek, *Palmer*, Seward, Unalaska, Valdez

*Fourth Judicial District* (4): *Bethel*, Delta Junction, *Fairbanks*, Tok

to be selected from existing court locations in the closest venue district that has an appropriate judge and facilities for an appropriately sized jury.

This, in essence, is the result we reached in *Wilson*. We held that a defendant charged with a crime committed in the Delta Junction venue district (or the Tok venue district) was not entitled to a presumptive trial site within that venue district. Rather, the presumptive trial site was Fairbanks—the designated felony trial site located in the closest venue district that had a resident superior court judge—and any request to move the trial elsewhere (such as Delta Junction or Tok) had to be made under Rule 18(e).

But if this is how the supreme court intended Rule 18(b)(3)-(4) to be interpreted, there would seemingly be no reason for the supreme court to go to the trouble of defining separate venue districts for Delta Junction and Tok. It would be sufficient to designate Delta Junction and Tok as alternative felony trial sites within a greater Fairbanks venue district. Similarly, there would be no apparent reason for the supreme court to define any of the other ten superior court venue districts that have no resident superior court judge.

Moreover, the result in *Wilson* is inconsistent with the lengthy table of venue sites that accompanies Criminal Rule 18. This table lists all the cities, towns, and villages in Alaska; for each one, the table specifies a district court trial site and a superior court trial site. It appears that the supreme court intended this table to be a "quick reference"—a list that judges and attorneys could use to easily find the presumptive trial site specified by Criminal Rule 18(b)'s four-part venue test for crimes committed in any of the listed cities, towns, and villages.

This table does not say that Fairbanks is the presumptive trial site for felonies committed in Delta Junction and Tok. Rather, for crimes committed in Delta Junction and the surrounding smaller communities (Big Delta, Dot Lake, Dry Creek, and Healy Lake), Delta Junction is listed as the presumptive superior court (*i.e.*, felony) trial site. Similarly, for crimes committed in Tok and the surrounding communities (Alcan, Boundary, Chicken, Chisana, Eagle, Eagle Village, Nabesna, Northway, Northway Junction, Tanacross, Tetlin, and Tetlin Junction), the table specifies Tok as the presumptive superior court trial site.

Finally, and most importantly, *Wilson's* interpretation of Rule 18(b) tends to defeat, rather than implement, a defendant's rights under *Alvarado*. Because of the substantial differences between rural village life and the life of Alaska's city dwellers, *Alvarado* guarantees criminal defendants the right to a jury pool that represents a fair cross-section of the community where the crime occurred. Criminal Rule 18 was designed to help judges locate a trial site where such a jury pool is available.

But under the interpretation of Rule 18(b) that we adopted in *Wilson*, Fairbanks—an urbanized, mostly non-Native city of 30,000—becomes the presumptive trial site for every felony committed in the rural villages and towns of the eastern Interior.[11] In essence, *Wilson* says that when a felony is committed in one of these villages and towns, if the defendant wants the trial to be held in a location where the jury pool meets the requirements of *Alvarado*, the defendant has to promptly file a motion under Rule 18(e) or forever lose that right. This result tends to defeat the very purpose of Rule 18, which is

---

**11.** According to the 2000 census, the population of Fairbanks is 30,224. Of those inhabitants, 20,150 identified themselves as white, 2994 identified themselves as Alaska Native, and 784 identified themselves as mixed Alaska Native and white.

By contrast, according to the 2000 census, the population of Tetlin is 117. Of those inhabitants, 111 identified themselves as Alaska Native, 3 identified themselves as mixed Alaska Native and white, and 3 identified themselves as white.

Tok has a population of 1393. Of those inhabitants, 1087 identified themselves as white, 179 identified themselves as Alaska Native, and 82 identified themselves as mixed Alaska Native and white.

This information is available at the following State of Alaska web site:

http://146.63.75.45/census2000/Census—LV2.asp

to preserve and implement the rights guaranteed by *Alvarado*.

For these reasons, we conclude that *Wilson's* interpretation of Rule 18(b) is mistaken. When Rule 18(b)(3) specifies that the presumptive trial site shall be located "within the venue district," it means "in the appropriate venue district (superior court or district court) containing the site where the crime is alleged to have occurred." In John's case, a felony is alleged to have occurred in Tetlin. The presumptive trial site must therefore be located within the Tok superior court venue district.

Admittedly, this interpretation has its own difficulties. Rule 18(b)(4) states that the presumptive trial site must be a court location "[t]hat has a judge." Tok has a resident magistrate, but it does not have a resident judge. The situation is the same in Delta Junction. All told, twelve superior court venue districts have no resident superior court judge, and only two of those venue districts (Homer and Valdez) have a resident district court judge. The remaining ten are served by magistrates.

It is difficult to tell what the supreme court had in mind. On the one hand, the court defined a dozen felony venue districts containing no resident judge, but yet containing an identified felony trial site (for example, Tok and Delta Junction). On the other hand, the court specified in Rule 18(b)(4) that a court location does not qualify as a presumptive trial site unless it "has a judge." These two actions appear to be irreconcilable.

But as we have just explained, if we interpret Rule 18 as we did in *Wilson*—attributing paramount importance to Rule 18(b)(4)'s requirement of a "judge"—we end up with a rule that tends to defeat the rights guaranteed by *Alvarado*. So, instead, we must interpret Rule 18 in a new way—by giving paramount importance to the venue districts and the felony trial sites designated by the supreme court on its venue map, and by interpreting clause (3) to require presumptive trial sites to be located within the venue district where the crime occurred.

We now hold that when a felony is committed within one of the twenty-five superior court venue districts drawn by the supreme court, the trial should presumptively be held in the city or town identified by the supreme court as the felony trial site of that district—even though that city or town may have no resident superior court judge. If there is another felony trial site on the administrative director's list of approved sites that is closer to the place where the crime is alleged to have occurred, the defendant can ask to have the trial moved there under Rule 18(e).

Based on our revised interpretation of Rule 18(b), John's trial should presumptively have been held in Tok, not Fairbanks. John did not need to invoke Rule 18(e) to obtain a trial in Tok; his trial should have been scheduled there in the first place. Because John was denied his right to trial in Tok, his conviction must be reversed.

### Other issues in the case

Although we are reversing John's conviction, we take this opportunity to address certain other issues in the event John's case is retried. Before this case went to trial, John had entered a no-contest plea and the superior court had ordered a presentence report. John prepared a hand written statement about the offense for inclusion in the report. The superior court later permitted John to withdraw his plea, and John moved to suppress the statement on a number of grounds. The court denied relief, and the statement was admitted at trial. We now address the court's rulings on John's motion to suppress this statement.

The grand jury indicted John on three counts of second-degree sexual abuse of a minor.[12] John then reached a plea agreement with the state, pleaded no contest to one count, and the State dismissed the other two counts.

The superior court scheduled the case for sentencing and ordered a presentence report as required by Alaska Criminal Rule 32.1. Also, the court ordered John to "report to

---

**12.** AS 11.41.436(a).

the Department of Corrections so that they can begin the presentence report, and [the judge] can do the sentencing in this matter[.]" The superior court warned John that he needed to be back for sentencing on December 9 and that failure to appear "is a felony subject [to] up to another five years in prison."

Glenn Bacon, a probation officer, was assigned to prepare the presentence report. On October 1, 1997, Bacon sent John's attorney a letter to John, which included a presentence questionnaire. The letter provided in relevant part:

[The court] has requested I do a presentence report for your case[.] This information is helpful for [the court]. Please fill out the enclosed presentence worksheet to the best of your ability, sign the Authorization to Release form, and return everything to our office in the enclosed envelope. Call me as soon as you receive the forms. It is *very important* that you get this done right away. My target date for completing the report is October 24, 1997, so I will need your information as much prior to that time as possible. If you have any questions, please call our toll-free number listed above.

John's attorney forwarded the presentence report packet to John without advising John how to respond to the questions. Because John had otherwise failed to follow release conditions, the court issued a bench warrant for John's arrest.

On October 28, 1997, John called Bacon and scheduled an appointment for November 3. When John arrived for the appointment, he had the questionnaire with him and told Bacon that "he might get something to [Bacon] within a day or two." Bacon then took John to the Alaska State Troopers' office, where the troopers arrested John on the bench warrant. The next day, John called Bacon from jail and informed Bacon that he had completed the presentence questionnaire.

The last page of the questionnaire was entitled "Statement/Remarks." It provided as follows:

This is your opportunity to make any statement you would like to have presented to the Court. It will be included in the pre-sentence report just as it is written and will not be changed in any way. It may help to know that the Court is particularly interested in your statements about the following:

1. Your version of the offense—what happened?

2. Why were you involved—why did you act as you did?

3. How do you feel about the offense, what you did, the results of your actions for you and others?

4. What are your plans or goals?

5. What are your thoughts concerning the possibility of any jail time imposed in your case?

John wrote the following by hand:

I feel very bad about the situation. It should never happen. Just something overcame me. I never did that before and never will again. I move from Tetlin to Mentasta and start a new life with Jesus. I met Jesus last June in Anchorage and living for the Lord. My plans are to go to work and start taking care of my kids and move to Anchorage with my girlfriend Phyllis Dahling.

If I get any jail time I deserve it because I violated God's child. If it's possible I would like to get a fine so I can pay for the kid[s] counseling. I can't do much in jail because I got child support to pay and they take all my money.

About a month later, the superior court appointed a new lawyer for John so that John could move to withdraw his plea. The court allowed John to withdraw his guilty pleas, and the case was reset for trial on all three counts.

John filed a motion to suppress the handwritten statement the day before trial was scheduled to begin. In the motion, John raised several claims: the State had obtained his statement in violation of *Miranda*,[13] the statement was involuntary, the statement was obtained in violation of his due process

---

**13.** 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

rights, and the court should exclude the statement under Evidence Rule 410(a).[14]

Instead of starting trial as scheduled, the court conducted an evidentiary hearing and heard arguments on John's motion. Before the witnesses were called, John told the court that his argument was narrower than the issues raised in his pleadings: "Judge, ... I'm actually making a threefold argument. First is *Miranda*, second is voluntariness, third is kind of a probative value versus prejudice [argument]."

John and Bacon testified. John said that when he changed his plea he had not understood that a presentence report would be prepared. He also testified that he did not think that he had any choice but to complete the presentence questionnaire. John claimed that when he contacted Bacon, he did not understand that he had the right to an attorney or to remain silent.

After the court heard this evidence, John argued only the *Miranda* claim and the voluntariness claim. The State challenged John's *Miranda* and voluntariness claims. In reply, John concluded his argument as follows: "And for the *Miranda* violations, for the voluntariness, and for the prejudice, Judge, [the statement] should be excluded." John did not argue due process or mention Evidence Rule 410. The court denied John's motion to suppress, and the trial began the next day. After jury selection, John returned to the court's ruling on the written statement, and focusing on the claim that the statement was more prejudicial than probative, asked the court to reconsider its ruling. The court declined to change the ruling and admitted the handwritten statement at trial.

John makes several claims why the superior court should have suppressed the handwritten statement. First, John argues that his Fifth Amendment rights were violated because he was subjected to custodial interrogation when he was completing the presentence worksheet, and he had not been advised of his rights under *Miranda*. John argues that he was subjected to custodial interrogation because he was completing the worksheet in connection with a criminal prosecution, because he had been ordered by a judge to cooperate with the Department of Corrections in preparing the presentence report, and because he had been told by Bacon, a probation officer, that he should complete the worksheet as thoroughly as possible to receive a fair sentence. John testified that he was not informed at any time that he could refuse to answer the questions in the worksheet.

The State argues that John's statement was not the product of a custodial interrogation requiring *Miranda* warnings, even though he was incarcerated at the time he filled out the questionnaire. The State contends that John was simply responding to Bacon's "broad request" that he complete the questionnaire and that there was no evidence that Bacon or anyone else suggested that John incriminate himself. The State argues that John could have left the page requesting the statement blank or could have refused to respond to the questionnaire entirely. The State also notes that the directions asked John to make any statement "you would like" to have presented to the Court. The State asserts that this language "clearly conveys" that it was John's personal decision whether or not to make a statement.

Before a person may be subjected to custodial interrogation, that person must be informed of the right against self-incrimination and the right to counsel.[15] The supe-

---

**14.** Alaska R. Evid. 410(a) provides:

(a) Evidence of a plea of guilty or nolo contendere, or of an offer to plead guilty or nolo contendere to the crime charged or any other crime, or of statements or agreements made in connection with any of the foregoing pleas or offers, is not admissible in any civil or criminal action, case or proceeding against the government or an accused person who made the plea or offer if:

 (i) A plea discussion does not result in a plea of guilty or nolo contendere, or

 (ii) A plea of guilty or nolo contendere is not accepted or is withdrawn, or

 (iii) Judgment on a plea of guilty or nolo contendere is reversed on direct or collateral review.

**15.** *See Hunter v. State*, 590 P.2d 888, 893 (Alaska 1979) (citing *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706 (1966)).

rior court found that John was not subjected to custodial interrogation. The court found that John had filled out the form while he was alone and that John could have chosen to complete the questionnaire or to stop at any time. John has not attacked these findings. Furthermore, John was represented by counsel when he answered this questionnaire, which he received from his attorney's office. John had several days in which to discuss the case and the questionnaire with his attorney. Based on our independent review of the record, we agree with the superior court's conclusion that John did not have to receive *Miranda* warnings before answering the questionnaire.[16]

Next, John argues that his statement was involuntary because he was presented with the choice of either fully answering the questions in the presentence worksheet or risking an unjust sentence. In support of his contention, John cites *Beavers v. State*[17] and *Raphael v. State*[18] for the proposition that a statement is involuntary if it is extracted by some action on the part of a State agent that is sufficiently compelling to overbear the person's will to resist.

John asserts that the circumstances in his case were sufficiently compelling to overbear his will. He notes that he was ordered by the court to cooperate in the preparation of a presentence report, was warned by the court that there would be adverse consequences if he did not appear for sentencing, was told by a State agent (a probation officer) that he was to fill out the presentence report as completely as possible, and was remanded into custody at the same time he was directed to complete the report. John also notes that the probation officer testified that it was his practice to "suggest ... that the more complete the picture that the court has when

it comes to sentencing, the 'fairer' the sentence will be." John testified that he believed he had no choice but to answer the questions in the presentence worksheet.

A trial judge considering a voluntariness challenge to the admission of a defendant's statement must conduct a three-step inquiry.[19] First, the trial judge must find the external facts surrounding the statement.[20] These findings will be upheld unless they are clearly erroneous.[21] Second, from these facts, the trial judge must infer the internal mental state of the defendant.[22] Third, the judge "must have assessed the legal significance of this inferred mental state"—whether the defendant made a voluntary waiver of his Fifth Amendment rights.[23] As to the second and third findings, we examine the entire record and make independent determinations, based on the totality of the circumstances surrounding the statements sought to be suppressed.[24] The circumstances relevant to the court's determination of voluntariness are "the age, mentality, and prior criminal experience of the accused; the length, intensity and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement."[25] The prosecution must prove the voluntariness of the confession by a preponderance of the evidence.[26]

Superior Court Judge Ralph R. Beistline found that John was not subjected to interrogation and that his statement was voluntary. He found that John was alone and "simply had to fill [the statement] out, or not, as he chose, and certainly could stop any time he wanted." He found that John did not face "specific threats." Judge Beistline's factual findings are supported by substantial evidence in the record. From our own review

---

**16.** *See Beaver v. State,* 933 P.2d 1178, 1184–85 (Alaska App.1997).

**17.** 998 P.2d 1040 (Alaska 2000).

**18.** 994 P.2d 1004 (Alaska 2000).

**19.** *See Aningayou v. State,* 949 P.2d 963, 966 (Alaska App.1997).

**20.** *See id.*

**21.** *See id.*

**22.** *See id.*

**23.** *Id.*

**24.** *See id.*

**25.** *Beavers,* 998 P.2d at 1044.

**26.** *See id.*

of the record, we agree with Judge Beistline's conclusion that John's statement was voluntary.

 John also claims that the statement should have been excluded under Evidence Rule 410. Evidence Rule 410(a)(ii) provides that "evidence ... of statements ... made in connection with [a plea] is not admissible ... if [a] plea ... is withdrawn[.]" John argues that his handwritten statement was made "in connection with" his withdrawn plea and that it should have been excluded under Evidence Rule 410.

In the superior court, John cited no case law supporting his claim that his statement should be excluded under Evidence Rule 410. His motion merely quoted portions of Rule 410. When the superior court held the evidentiary hearing to consider John's motion to suppress, John did not raise his Rule 410 claim. In fact, John never mentioned or relied on Rule 410 during the evidentiary hearing on his motion to suppress and explicitly argued other grounds: "First is *Miranda*, second is voluntariness, third is kind of a probative value versus prejudice [argument]." Furthermore, the superior court did not mention Evidence Rule 410 in its rulings.

We note that there is case law from other jurisdictions excluding statements analogous to those John made,[27] and there is case law that does not exclude such statements.[28] In addition, the Commentary to Evidence Rule 410 indicates that one of the basic goals of the rule is to insure fair treatment after pleas are withdrawn:

> To insure fair treatment for defendants whose pleas are entered and later withdrawn or overturned, this rule provides that the slate should be wiped clean and that no part of the plea process can be used for impeachment or any purpose against the defendant in subsequent proceedings (unless made in court, and they

are voluntary and reliable) or in a perjury prosecution.

However, the record does not reflect a ruling by the superior court on John's Evidence Rule 410 claim. Therefore, we express no opinion on the merits of this claim.

John's remaining argument is that due process was violated because his change of plea was a contract with the State that any actions "after his entry of [the] plea relevant to sentencing would be limited to that purpose." However, John has cited no authority for this contract-based due process claim. Accordingly, we reject it.

John's remaining claims are based on the conduct of the trial in his case and we need not address them.

### Conclusion

The judgment of the superior court is REVERSED.

MANNHEIMER, Judge, concurring.

I agree with my colleagues that this court misinterpreted Criminal Rule 18 in *Wilson v. State*.[1] I am writing separately for two reasons: first, to issue a *nostra culpa* with regard to this court's long-ago decision not to publish *Wilson*, and second, to discuss some of the problems inherent in our policy of issuing most of our decisions as memorandum opinions.

Since the mid–1960s, American appellate courts have been issuing decisions that are designated as "memorandum" or "unpublished" opinions. The use of unpublished decisions was in full swing when the Alaska Legislature created the Court of Appeals in 1980, and one of this court's early administrative acts was to promulgate a standing order governing the issuance of unpublished decisions.

In Standing Order No. 3 (issued March 20, 1981), this court adopted "Guidelines for

---

**27.** *See State v. Reutebuch*, 24 Kan.App.2d 658, 953 P.2d 227, 228 (1997); *State v. Jackson*, 325 N.W.2d 819, 822 (Minn.1982).

**28.** *See United States v. Lloyd*, 43 F.3d 1183, 1186 (8th Cir.1994); *United States v. Perez–Franco*, 873 F.2d 455, 460–61 (1st Cir.1989).

**1.** Alaska App. Memorandum Opinion No. 1893 (October 11, 1989).

Publication of Court of Appeals Decisions". Paragraph 1 of these Publication Guidelines declares that it is this court's policy to "reduce the proliferation of published opinions" by "avoid[ing] the [publication] of lengthy opinions dealing with legal issues of little or no precedential value or of minimal public interest". An opinion will not be published if the court concludes that the opinion does not present "new points of law [giving] the decision ... value as precedent".

Paragraph 2 of the Publication Guidelines clarifies this policy by specifying that Court of Appeals decisions should not be published unless they meet one or more of the following criteria:

(a) the opinion establishes a new rule of law [or] alters, clarifies[,] or modifies an existing rule; or

(b) the opinion involves a legal issue of continuing public interest; or

(c) the opinion criticizes existing law; or

(d) the opinion resolves or comments upon an apparent conflict of authority.

If this court concludes that an opinion does not meet any of these criteria, the opinion will not be published. And to make sure that our appraisal of the opinion is binding, Paragraph 7 of the Publication Guidelines states that our unpublished decisions "[are to] be considered ... to have no precedential value."

The original idea was that unpublished decisions would truly not be published—*i.e.,* not widely disseminated, and not printed in the reporters. Copies would be sent to the parties and to all judges in the state, but the opinion would not be distributed to the public at large, nor would it be sent to any legal publisher. Paragraph 6 of the Publication Guidelines states that memorandum opinions are to be routinely distributed

only to the parties and/or their respective counsel, to justices and judges of the State of Alaska, and to the Administrative Director of the Court System, provided, however, that [memorandum opinions] shall be available upon request through the office of the clerk of the appellate courts to the press and to all members of the public.

But in practice, distribution of our memorandum decisions has never been as limited as Paragraph 6 might suggest.

Because this court's jurisdiction is confined to criminal cases and other litigation arising from criminal cases, and because only a small percentage of the bar practices criminal law, this court has a fairly well-defined readership. There are three groups of lawyers whose professional duties motivate them to follow our decisions: judges, prosecutors, and criminal defense attorneys. Most of the prosecutors work for one state agency, the Alaska Department of Law. Moreover, a large number of the defense attorneys—and the ones who are most likely to litigate criminal appeals—are employed by (or work under contract with) one of two other state agencies: the Public Defender Agency and the Office of Public Advocacy. Our clerk's office routinely delivers copies of all of our memorandum opinions to these state agencies (even the decisions issued in cases not involving these agencies). So although this court has traditionally distributed only a few dozen copies of our memorandum decisions, those copies have always gone to essentially every judge and lawyer who regularly practices criminal law in this state.

In addition, our memorandum opinions are now readily available on the Internet. They can be found (and downloaded) at the Alaska Court System's web site (*www.state.ak.us/courts/moj.htm* ), and they are also available through at least one of the electronic legal research services (West Publishing's "Westmate").

In other words, our unpublished opinions are in fact "published" in the normal sense of the word: they are distributed to practically everyone who has a professional interest in reading them, and they are readily available to anyone else. It would seem, then, that our decision not to publish an opinion has only one real effect: as declared in Paragraph 7 of the Publication Guidelines, unpublished opinions "have no precedential value". But even here, the reality is not what the Guidelines suggest.

One of the important tasks of lawyers and trial judges is to evaluate what an appellate court has done in the past and then, based on

these past actions, predict what the court is likely to do in the future.[2] This court publishes only about one-fifth of its decisions.[3] This means that if judges and lawyers want to find out how we view the law and how we have applied the law in particular situations, most of the information they seek will be found in our memorandum opinions.

Another fact of legal life in Alaska is that this court has only three members. In many states, the intermediate courts of appeal resemble the federal model: the courts are divided into districts or divisions, and each district or division often has many judges. In California, for example, there are six appellate districts and ninety-three intermediate appellate court judges.[4] In such states, a memorandum decision issued by a single panel in a single district may have comparatively little weight, even within that district. But in Alaska, the same three judges decide almost every criminal appeal. Thus, even though our memorandum decisions may not be citable as legal precedent, they are a relatively good predictor of how this court will evaluate future cases.

Given all this, it is hardly surprising that trial judges and lawyers use our memorandum decisions in ways not contemplated by Paragraph 7 of the Publication Guidelines. It is not unusual to read a transcript of trial court proceedings in which the lawyers and the judge discuss one of our memorandum opinions because the decision is seemingly pertinent to the case before them. If pressed, they will acknowledge that the memorandum decision is not "precedent", but they treat it as if it were precedent—because, for the purpose of predicting our future action, it practically is.

This fact was brought home to me when this court was working on the venue issue in John's case. We were trying to figure out what Criminal Rule 18(b) meant, so we asked the Court Rules Attorney if we could examine the legislative history file on Criminal Rule 18. In that file, we discovered a copy of our memorandum decision in *Wilson v. State.* The Rules Attorney had kept a copy of *Wilson* because, in *Wilson,* this court construed Rule 18(b). True, *Wilson* was not a published decision, but it was our only decision construing Rule 18(b), and there was no reason to suppose that we would reach a different decision in a subsequent case.

Our discovery of *Wilson* in the Rules Attorney's file demonstrates a pitfall inherent in our system of "published" and "unpublished" decisions: so many of our decisions are unpublished that, given enough time and enough change of personnel, the court "forgets" that we issued those decisions. West Publishing only recently started including our memorandum decisions in their databases, so any memorandum decision issued more than a couple of years ago is very hard to find through normal search techniques. *Wilson* was issued twelve years ago, in October 1989. Even though *Wilson* contains a direct ruling on the venue issue presented in John's appeal, we did not know about that ruling until we found a copy of the decision in the Rules Attorney's file.

This problem of "lost" decisions is exacerbated by the rules that seemingly forbid attorneys from bringing our prior memorandum decisions to our attention. I do not know whether the attorneys in John's case were aware of *Wilson.* But if they were, they knew that *Wilson* was unpublished and therefore not "precedent", and they probably concluded that there was no proper way for them to apprise us of *Wilson's* interpretation of Criminal Rule 18 and then ask us either to re-affirm or overrule *Wilson.*

I am aware of the growing controversy over the propriety—even the legality—of ap-

---

**2.** *See* Lauren K. Robel, *The Myth of the Disposable Opinion: Unpublished Opinions and Government Litigants in the United States Courts of Appeals,* 87 Mich. L.Rev. 940 (1989), pp. 947–48, 956–57.

**3.** Between January 1, 1996 and October 15, 2001, this court issued a total of 1445 opinions (not including the 30 that were later withdrawn and superseded by another opinion). Of these 1445 opinions, 308 (twenty-one percent) were issued as published opinions and 1137 (seventy-nine percent) were issued as memorandum opinions.

**4.** *See* www.courtinfo.ca.gov/courts/courtsofappeal/about.htm.

pellate courts' issuing unpublished opinions.[5] For present purposes, I assume both that Standing Order No. 3 is legal and that it embodies salutary policy. But if we are to divide our opinions into "published" and "unpublished", we must endeavor to apply the Guidelines for Publication in a careful and consistent manner.

*Wilson* is an example of an opinion that should have been published. In *Wilson,* this court construed Criminal Rule 18(b) and rejected the argument that a felony committed in the Delta Junction venue district should presumptively be tried in Delta Junction. Referring to the criteria for publication listed in Paragraph 2 of the Guidelines, *Wilson* "establishe[d] a new rule of law ... [or] clarifie[d] ... an existing rule", and it also "involve[d] a legal issue of continuing public interest".

In the future, I promise to pay close attention to the Publication Guidelines when this court decides whether to publish an opinion. In addition, I encourage litigants to ask for publication of memorandum decisions that appear to meet the criteria found in Paragraph 2 of those Guidelines.

Appendix

GUIDELINES FOR PUBLICATION

OF COURT OF APPEALS DECISIONS

1. *Statement of policy.* It shall be the general policy of the Court of Appeals to avoid the use of lengthy opinions dealing with legal issues of little or no precedential value or of minimal public interest and to reduce the proliferation of published opinions. It is unnecessary for the court to issue fully explained, written opinions in every case. Similarly, it is unnecessary for the court to publish all decisions, whether explained or unexplained. The fact that a decision is unexplained or not published does not signify that the case is considered by the court to be unimportant. It does mean that, in the view of the court, no new points of law

making the decision of value as precedent are believed to be involved.

2. *Standard for publication of opinions.* A decision of the [C]ourt of [A]ppeals shall not be designated for publication unless:

(a) [t]he opinion establishes a new rule of law [or] alters, clarifies[,] or modifies an existing rule; or

(b) the opinion involves a legal issue of continuing public interest; or

(c) the opinion criticizes existing law; or

(d) the opinion resolves or comments upon an apparent conflict of authority.

3. *Decision to publish; publication of concurring and dissenting opinions.* Decisions of the court shall be published only if the majority of the judges participating in the decision find that a standard for publication as set out in Section 2 of these guidelines is satisfied, except that an opinion shall be published if it is accompanied by a separate concurring or dissenting opinion, and the author of the separate opinion desires that it be published and distributed to regular subscribers. Dissenting or concurring opinions should be designated for publication only if the dissenting or concurring judge determines that a standard for publication as set out in Section 2 of these guidelines is satisfied. Any originally unpublished opinion, concurrence[,] or dissent of the [C]ourt of [A]ppeals may subsequently be published by order of the Alaska Supreme Court.

4. *Partial publication.* If a standard for publication as set out in Section 2 of these guidelines is satisfied as to only a part of a decision, the court may designate only that part for publication.

5. *Time for deciding on publication.* The members of the court shall, in each case, consider the question of whether or not to publish an opinion at the initial conference on the case[] and[,] at that time, make a tentative decision whether or not to publish.

6. *Designation of decisions.* All decisions that are found to satisfy a standard for publication as set forth in Section 2 of these

---

5. The reader is invited to study the eleven articles on this subject contained in the Journal of Appellate Practice and Process, Vol. 3, Number 1 (Spring 2001), and to read the Eighth Circuit's

decision in *Anastasoff v. United States,* 223 F.3d 898 (8th Cir.2000), *vacated as moot,* 235 F.3d 1054 (8th Cir.2000) (*en banc* ).

guidelines shall be designated simply as "OPINIONS" of the court. All explained decisions of the court which do not meet any standard for publication specified in Section 2 of these guidelines shall be designated as "MEMORANDUM OPINIONS [AND] JUDGMENTS" and shall not be published. An OPINION or a MEMORANDUM OPINION AND JUDGMENT of the court may be signed by the judge who wrote it or may be issued in *per curiam* form, and these designations shall have no effect on whether the OPINION or MEMORANDUM OPINION AND JUDGMENT is published. All unexplained decisions of the court shall be designated as "SUMMARY DISPOSITIONS" and shall not be published. Unpublished decisions of the Court of Appeals shall routinely be distributed only to the parties and/or their respective counsel, to justices and judges of the State of Alaska, and to the Administrative Director of the Court System, provided, however, that at all times unpublished decisions of the [C]ourt of [A]ppeals shall be available upon request through the office of the clerk of the appellate courts to the press and to all members of the public.

7. *Precedential value of unpublished opinions.* In keeping with the provisions of [A]ppellate [R]ule 214[,] unpublished decisions of the [C]ourt of [A]ppeals, whether in the form of MEMORANDUM OPINIONS [AND] JUDGMENTS or SUMMARY DISPOSITIONS, shall be considered by the court to have no precedential value.